# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LADY BENJAMIN PD CANNON f/k/a Ben Cannon, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2021-0171-PAF |
| ROMEO SYSTEMS, INC., a Delaware Corporation, ROMEO POWER, INC., a Delaware Corporation, and MICHAEL PATTERSON, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 10, 2024
Date Decided: October 7, 2025

Brett D. Fallon, Patrick A. Jackson, Jaclyn C. Marasco, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Josh Peterson, FAEGRE DRINKER BIDDLE & REATH LLP, Minneapolis, Minnesota; M. Cris Armenta, M. CRIS ARMENTA, PC, San Diego, California; *Attorneys for Plaintiff Lady Benjamin Cannon.*

A. Thompson Bayliss, S. Michael Blochberger, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Mark Mermelstein, Andrew B. Holmes, HOLMES, ATHEY, COWAN, & MERMELSTEIN LLP, Los Angeles, California; *Attorneys for Defendant Michael Patterson.*

**FIORAVANTI, Vice Chancellor**

This case involves a dispute over a warrant for the purchase of stock in a Delaware corporation. The corporation, which was a start-up at the time, issued the warrant to a consultant to resolve a payment dispute. The corporation's founder and chief executive officer, who was also its sole director, personally handled the negotiations over the warrant with the consultant. The corporation's initial draft of the warrant indicated that it was for one percent of the corporation's outstanding shares at the time of issuance. The consultant changed the warrant to reflect that it was for one percent of the corporation's outstanding shares at the time of exercise. The corporation's CEO/sole director executed the warrant but admits that he did not read the execution version before signing it or inquire whether there had been any changes proposed. The corporation recorded the warrant on its books as being for 100,000 shares, purportedly representing one percent of the total outstanding shares as of the date of the warrant. As a consequence of a subsequent 10-for-one stock split, the corporation increased the number to 1,000,000 shares.

The CEO later made a personal loan to the consultant, which was documented in a promissory note and pledge agreement. The pledge agreement referred to a warrant for 1,000,000 shares. The consultant defaulted, the CEO caused the corporation to transfer the warrant to him, and he later exercised the warrant, receiving 1,000,000 shares. The corporation later entered into an agreement to be acquired by a public company in a stock-for-stock merger. Upon reading the

announcement, the consultant started asking the corporation questions about the warrant. The corporation said the warrant had been transferred to the CEO.

In the merger, the CEO received 121,730 shares of the post-merger company for the 1,000,000 warrant shares. Shortly after the consummation of the merger, the consultant filed suit, seeking payment for the warrant and the value of the shares underlying the warrant. The consultant contends the warrant would have entitled her to 965,246 shares in the post-merger corporation, not the 121,730 shares that the CEO received and later sold.

The CEO presents a panoply of defenses and arguments to defeat the consultant's claims. None of them are persuasive. For the reasons that follow, the court concludes that the CEO converted the warrant and that the consultant is entitled to damages based upon the highest intermediate value of the 965,246 warrant shares within a reasonable period following the closing of the merger.

## I.    BACKGROUND

These are the facts as the court finds them after trial.[1]

---

[1] Other factual findings are contained in the analysis of the claims. Deposition testimony is cited as "(Surname) Dep.," with dates for individuals who have multiple depositions; trial exhibits are cited as "JX"; stipulated facts in the pre-trial order are cited as "PTO"; and references to the docket are cited as "Dkt.," with each followed by the docket number and the relevant section, page, paragraph, or exhibit. Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not

## A. Parties and Relevant Non-Parties

Romeo Systems, Inc. ("Romeo Systems" or the "Company") was incorporated in Delaware in 2014.[2]  At that time, the Company was authorized to issue up to ten million shares of common stock.[3]  Romeo Systems is the predecessor to Romeo Power, Inc. ("Romeo Power"), a Delaware corporation, which acquired Romeo Systems in December 2020.[4]

Michael Patterson, the Company's founder, explained that the focus of the business was to develop a portable kinetic energy device.[5]  Patterson served as the

---

clear from the text.  Citations to the transcript of post-trial oral argument, Dkt. 247, are in the form of "Post-Trial Arg."  After being identified initially, individuals are referenced herein by their surnames without regard to honorifics.  No disrespect is intended.  Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.  When resolving factual disputes, this decision generally gives more weight to contemporaneous evidence. *See Lynch v. Gonzalez*, 2020 WL 4381604, at *5 (Del. Ch. July 31, 2020) ("[T]he relative weight given to any particular piece of evidence, and particularly witness testimony, is a matter for the court to determine as the trier of fact."  (citation modified)), *aff'd*, 253 A.3d 556 (Del. 2021) (TABLE); *see, e.g.*, *BCIM Strategic Value Master Fund, LP v. HFF, Inc.*, 2022 WL 304840, at *2 (Del. Ch. Feb. 2, 2022) ("The witness testimony often conflicted with the contemporaneous record.  In resolving factual disputes, this decision generally has given greater weight to the contemporaneous documents.").

[2] PTO ¶ 1.

[3] *Id.*; JX 4 at Art. IV.

[4] PTO ¶¶ 53, 55.

[5] Tr. 187:19–188:2 (Patterson); *id.* at 274:13–24 ("Q.  [T]he initial concept for Romeo Systems was . . . to create portable and kinetic charging systems for energy-poor people in different countries; correct?  A.  That's correct.  Q.  So the idea was to come up with something that looked like a lightsaber, and you could use the energy, the kinetic energy, almost like a windmill to create energy, and it would store energy for people; correct?  A. Yes.  So something to capture the energy and then store the energy.").

3

Company's chief executive officer ("CEO") until September 4, 2020, and the chairman of the Company's board of directors (the "Board") until shortly before the closing of the merger in December 2020.[6] After stepping down as CEO, Patterson served as chief sales officer of Romeo Power until April 15, 2021.[7] Patterson is no longer employed by Romeo Power.[8]

Lady Benjamin Cannon was a paid consultant to Romeo Systems. The terms of that consultancy are documented in a December 29, 2014, contract (the "Consulting Agreement"), through which Cannon agreed to assist Romeo Systems with developing its technology.[9] The Consulting Agreement was for a one-year

---

[6] PTO ¶¶ 52–53.

[7] PTO ¶ 54.

[8] *See id.*; *see also* Tr. 187:6–8 (Patterson).

[9] JX 6; PTO ¶¶ 5–6; Tr. 188:11–20, 276:3–15 (Patterson). Cannon also assisted Romeo Systems's outside counsel with preparing certain patent applications. PTO ¶ 6; Tr. 276:16–277:1 (Patterson). Cannon is listed as an inventor on two of Romeo Systems's patent applications filed with the United States Patent and Trademark Office and the World Intellectual Property Organization. PTO ¶¶ 7–9; *see* JX 8; JX 9. Around February 2016, Cannon and Patterson began negotiating an agreement pursuant to which Cannon would become a full-time executive employee of Romeo Systems and receive additional equity via her employment. PTO ¶ 37. At some point thereafter, the negotiations broke down, and Cannon never became a formal employee of Romeo Systems. PTO ¶ 39; *see* Tr. 207:22–208:15 (Patterson); PTO ¶ 39. She nevertheless served as the Company's chief technology officer for part of 2016. PTO ¶¶ 28, 39.

4

term, commencing on January 5, 2015.[10]  Romeo Systems agreed to compensate Cannon at the rate of $575 per day and to pay Cannon bi-weekly upon receipt of an invoice.[11]  The Company had no funding sources at the time, so Patterson personally paid Cannon for her services under the Consulting Agreement.[12]

## B.  The Payment Dispute and the Warrant

On August 10, 2015, Cannon emailed Patterson a letter demanding payment of unpaid services under the Consulting Agreement.[13]  Cannon demanded payment of $31,206.97, consisting of:  (i) $9,156.97 in unpaid service fees as of June 22, 2015, (ii) a $4,800 "late fee," and (iii) a 30-day termination fee of $17,250.[14]  Unless

---

[10] JX 6 §§ 1.2, 4.1; PTO ¶ 4.  The Consulting Agreement permitted termination by either party after one year, upon 30 days' notice.  JX 6 § 4.1; PTO ¶ 4.  Anastasi Michailidis signed the Consulting Agreement on behalf of Romeo Systems as "Managing Partner." JX 6 at 5; Tr. 279:19–24 (Patterson) (testifying that Patterson authorized the Company to enter into the Consulting Agreement).

[11] JX 6 § 3.1; PTO ¶ 5.

[12] Tr. 279:2–11 (Patterson).  At the time, Cannon, Patterson, and Michailidis, who was Patterson's nephew, were the only individuals working at Romeo Systems.  *Id.* at 278:20–279:1 (testifying that the only people working at Romeo Systems were Cannon, Patterson, and Michailidis, and, potentially, "one other helper named Brian Farrell, who was more of a handyman.").

[13] JX 11; PTO ¶ 10.

[14] JX 11 at 1, 4.  The invoice indicated that the late fee was $100 per day and the payment was 48 days late ($100 x 48 = $4,800).  *Id.* at 4.  Cannon acknowledged that the Consulting Agreement did not provide for a late fee but contended that she was entitled to it under "state law."  7/26/22 Cannon Dep. at 156:2–18.  The invoice indicated that the termination fee was $575 per day ($575 x 30 = $17,250).  JX 11 at 4.  Cannon claimed that Section 4.1 of the Consulting Agreement entitled her to a termination fee.  7/26/22 Cannon Dep. at 156:25–157:11.  It does not.  *See* JX 6 § 4.1.

5

Romeo paid the outstanding balance, Cannon threatened to "commence legal action" against Romeo Systems, Patterson, Patterson's previous company, InAuth, and Bain Capital Ventures, an InAuth investor.[15]

On August 19, 2015, Cannon and Patterson negotiated a settlement via email. Patterson offered to:

> pay you $13k and and [*sic*] grant you equity of 1%. If you come back to work after we get funding I will add another 2% upon signing and work out a more comprehensive deal.[16]

Cannon responded: "Assuming a non-dilution guarantee, Done."[17] Cannon and Patterson, on behalf of Romeo Systems, executed a Full and Final Release the same day (the "Release"). In the Release, Cannon agreed to a:

> full release upon receipt of $13,000.00 on or before 8/21/15, and a document(s) or stock certificates guaranteeing [her] 1%, "full ratchet" non-dilatable [*sic*], shares of Romeo Systems [], the owner of the [Romeo Systems] Patent that CANNON worked on while working with the company, to be issued to CANNON no later than Aug 31, 2015.[18]

On August 30, 2015, Patterson sent an email to Cannon attaching a draft "Warrant to Purchase Shares Common Stock of Romeo Systems, Inc." (the "Draft Warrant").[19] The Draft Warrant was dated August 31, 2015, and had been prepared

---

[15] JX 11 at 2; Tr. 193:23–194:6 (Patterson).

[16] JX 17 at 1.

[17] *Id.*

[18] JX 16 ¶ 1; PTO ¶ 14.

[19] PTO ¶ 15; JX 23; Tr. 198:22–199:11 (Patterson).

by the law firm of Wilson Sonsini Goodrich & Rosati, P.C. ("Wilson Sonsini").  In his email transmitting the Draft Warrant, Patterson stated:

> I hope you had a good weekend.  Please take a look at the attached. Basically a warrant for up to 1%...exercise price of .01 (practically free).  Please take a look and if you are good with the agreement I need you to fill out the document and return to me and we will both sign.[20]

In a boldface header on the right side of the first page, the Draft Warrant stated:  "Warrant to Purchase [Up to 1.0% of ROMEO SYSTEMS, Inc. On a Fully Diluted Basis *at the Time of Issuance*.]."[21]  Section 1(a), titled "Number of Shares," provided "the Holder with the right to purchase up to one percent (1%) Shares prior to (or in connection with) the expiration of this Warrant as provided in Section 8."[22] The exercise price per share was $0.01.[23]  The Draft Warrant had an expiration date of August 31, 2018.[24]

Cannon did not immediately respond to Patterson's August 30 email.  Instead, on September 1, 2015, Cannon sent the Draft Warrant to her attorney, Marc Indeglia, of the California law firm of Indeglia & Carney LLP.  Cannon asked Indeglia to

---

[20] JX 23 at 1.

[21] *Id*. at 2 (citation modified).

[22] *Id*.  The Draft Warrant did not contain a final number of shares.  *Id.*  It also contained track changes in Section 5(a).  *Id*. at § 5(a).

[23] JX 23 at § 1(b).

[24] *Id*. at §§ 1(c), 8(a); PTO ¶ 15.  At trial and in their briefing, the parties utilized the term "Summer Warrant" when referring to the Draft Warrant.

review the Draft Warrant and indicated that she wanted "unbelievable [*sic*] shares that are warranted to stay at 1%."[25]  Six weeks later, on October 19, 2015, Indeglia emailed Cannon clean and redline versions of the Draft Warrant with Indeglia's proposed revisions.[26]  Indeglia revised the language in the boldface header to read: "Warrant to Purchase [Up to 1.0% of ROMEO SYSTEMS, Inc. On a Fully Diluted Basis at the *Time of Exercise*]."[27]  The following depicts Indeglia's revisions to Section 1(a):

> *Number of Shares*.  Subject to Section 3 and any previous exercise of the Warrant, the Holder shall have the right to purchase ~~up to one percent (1%) Shares~~<u>from the Company duly authorized and validly issued Common Stock equal to the Applicable Percentage of the Common Stock Deemed Outstanding, in each case, on the date of any exercise of this Warrant, at a purchase price equal to the applicable</u>

---

[25] PTO ¶ 16; JX 30 at 4; Tr. 9:12–23 (Indeglia) ("Q.  [H]ow did you come to represent Ms. Cannon in connection with the warrant in 2015?  A.  Ms. Cannon contacted me and asked me if I could review a warrant for her that she was going to be receiving in a startup company.  Q.  Do you recall what she asked you to do in connection with the warrant?  A. Yes.  She asked me to look it over and see if it was consistent with what she had understood she was supposed to be receiving.  So she sent me a Word version of a draft warrant.").

[26] JX 29 at 1; *see* JX 27 (redline version); JX 28 (clean version).

[27] JX 27 at 1 (emphasis added); Tr. 32:17–33:19 (Indeglia) ("Q.  Why did you make that change?  A.  Well, because if she exercised – if she only got 1 percent when this warrant was issued, it was really a warrant for a fixed number of shares.  And at the time, I didn't even know what that number was.  I didn't have any information about Romeo [Systems]. But by making it at the time of exercise, I didn't need to know that information, because by making it upon exercise, it would just be 1 percent whenever she chose to exercise it. And then she would have a -- become a 1 percent shareholder. . . .  I thought it was a clean fix for what she was trying to accomplish. . . .  [I]t was consistent with the original email [she sent to me] and with my discussion with her.").

8

Exercise Price, prior to (or in connection with) the expiration of this Warrant as provided in Section 8.[28]

Directly below Section 1(a), Indeglia added definitions for "Applicable Percentage," "Common Stock Deemed Outstanding," "Convertible Securities," "Options," and "Partial Exercise Percentage."[29] Indeglia also changed the expiration date from August 31, 2018, to August 31, 2025.[30]

On December 25, 2015, Cannon emailed to Patterson an executed version of the Draft Warrant, as revised by Indeglia, in a Portable Document Format (PDF) (the "Warrant").[31] Cannon wrote: "Attached please find the signed stock agreement. If you could counter-sign and return that would be great."[32] Cannon's email to Patterson did not include the redline version of the Draft Warrant that Indeglia sent to her in October.[33] The Warrant that Cannon executed and emailed to Patterson differed materially from the Draft Warrant. Most notably: "(i) the number of shares of common stock of Romeo Systems for which the Warrant would be exercised

---

[28] JX 27 at § 1(a). *See* Tr. 34:1–35:4 (Indeglia).

[29] JX 27 at 1–2.

[30] *Id*. at § 8. Indeglia testified at trial that he was not aware of the Release. Tr. 73:17–18 (Indeglia).

[31] JX 34; PTO ¶ 20. At trial and in their briefing, the parties utilized the term "Christmas Warrant" when referring to the warrant sent by Cannon to Patterson on December 25, 2015.

[32] JX 34 at 1.

[33] PTO ¶ 21. *See* JX 34.

9

would be one percent (1%) of the Common Stock Deemed Outstanding on the *date of exercise*, and (ii) the expiration date was August [3]1, 2025."[34]

On December 27, 2015, Patterson acknowledged receipt of Cannon's email and indicated he would "print and return from the office tomorrow."[35] The next day, Patterson countersigned the Warrant and returned the signature page to Cannon via email, stating "Please see the executed sig page attached. You are recorded as of today."[36] Prior to Patterson's execution of the Warrant, Cannon did not communicate that the attachment she emailed to Patterson on December 25 differed from the Draft Warrant.[37] Nor did Cannon represent that she had *not* made any changes to the Draft Warrant, and Patterson never asked whether she had. At the time he executed the Warrant, Patterson was the Company's sole director.[38]

---

[34] PTO ¶ 22.

[35] *Id.* at ¶ 24; JX 35.

[36] JX 36 at 1; PTO ¶ 25; Tr. 204:24–205:9 (Patterson). Patterson testified that he opened Cannon's December 25 email, "clicked on the attachment," and "scanned" it. *Id.* at 311:11–24; *id.* at 344:14–19 ("Q. Now, when you received the Christmas [W]arrant, you didn't actually print it out and compare it with the [S]ummer [W]arrant . . . did you? A. No. . . . I glanced at them."). Patterson also testified that he "could have read [the Warrant] in full" and "could have sent [the Warrant]" to legal counsel to review prior to execution, but he did not do so. *Id.* at 315:3–11; *id.* at 311:8–10, 316:2–10, 316:17–19.

[37] PTO ¶ 27.

[38] Tr. 386:2–387:24 (Patterson); *id.* at 481:3–9 (Webb); *see also id.* at 377:1–379:7 (Patterson). Patterson's testimony that his daughter had served as a director for some unknown period in 2015 is not credible. See *id.* at 286:24–288:6. Patterson offered no documentary evidence that suggested there was any other director on the Board at the time he executed the Warrant. In neither his proposed findings of fact nor his post-trial brief does Patterson dispute that he was the sole director at the time he signed the Warrant.

10

## C. Recording of the Warrant

On December 7, 2016, Patterson emailed Cannon, stating that Romeo Systems was "going through some clean up" of its corporate records.[39] Patterson wrote: "I want to make sure you are all set up on the shareholder list. Please send me any emails/docs that we have agreed on."[40] Cannon responded to Patterson with an email attaching a copy of the Warrant.[41] Upon receipt of Cannon's email, Patterson forwarded the Warrant to Lauren Webb (a Company consultant and soon-to-be Chief Financial Officer) and to the Company's then-counsel at Orrick, Herrington & Sutcliff ("Orrick").[42] Webb recorded the Warrant on Romeo Systems's capitalization table as a warrant for 100,000 shares, with an expiration date of August 31, 2025.[43]

---

[39] JX 60 at 1. At that time, the Company did not have a complete capitalization table. Tr. 403:24–404:6 (Webb) ("Q. [W]hen you started doing consulting work for Romeo [Systems], did it have a comprehensive cap table? A. No, I don't believe it had a full and complete one. Q. And was one of your jobs to compile a comprehensive cap table? A. Yes.").

[40] JX 60 at 1.

[41] JX 61. The Warrant circulated by Cannon included Cannon's executed signature page, but did not include Patterson's executed signature page. *Id.*

[42] Tr. 209:16–210:6, 342:16–24, 343:5–9 (Patterson). Patterson testified that he did not read the Warrant before forwarding it to Orrick. *Id.* at 210:4–8.

[43] *Id.* at 405:18–20, 406:20–21, 407:9–11 (Webb). Webb testified that she did not understand how the Warrant was for 100,000 shares after reading it, but became comfortable with that interpretation after discussing it with Patterson and reviewing other

On February 12, 2017, the Romeo Systems Board executed a unanimous written consent, stating that the "Company previously issued to . . . Cannon a warrant to purchase 100,000 shares of Common Stock" and ratifying the issuance of Cannon's warrant.[44]  The Board also authorized an amendment to the Company's certificate of incorporation to effect a ten-for-one stock split.[45]  The stock split was completed on February 21, 2017.[46]  Following the stock split, Romeo Systems updated its capitalization table to reflect that the Warrant was now for 1,000,000 shares.[47]

In July 2018, KPMG, the auditor for a counterparty exploring a business transaction with Romeo Systems, flagged a discrepancy between the Warrant and the Company's capitalization table.  The Warrant discrepancy was one of several

---

instruments issued to Romeo Systems's employees in 2016.  *Id.* at 407:12–408:10; *id.* at 479:1–9 ("Q.  [W]hen you went to [] Patterson and you asked him, when you were cleaning up the shareholder table, how many shares that warrant was worth, he told you 100,000; correct?  A.  He did.  And it was consistent with all of the other grants that were done that were similar; and the difference was that Cannon was not an employee so did not receive an employee stock grant.").  Prior to this litigation, Webb never received or reviewed a copy of the Draft Warrant, and Romeo Systems did not have a copy of the Draft Warrant in its records.  *Id.* at 482:3–6; PTO ¶ 30.

[44] JX 66 at 2; PTO ¶ 34.  By this time, Romeo Systems had a five-member board, on which Patterson served as chair.  *See* JX 66 at 11.  The Board did not document the authorization of Cannon's warrant at the time it was issued.  PTO ¶ 31; JX 66 at 2 ("The Board failed to document the authorization of the Warrant at the time that the issuance of the Warrant was made.").

[45] JX 66 at 2–3.

[46] PTO ¶ 35.

[47] *Id.* ¶ 36.

issues identified in a memo that KPMG sent to the Company's controller and Webb. The pertinent part states: "The 'warrant summary report' indicates that the number shares that could be obtained is 1,000,000 whereas in the 'Cannon warrant agreement' the warrant relates to the purchase up to 1% of Romeo [Systems] on a fully diluted basis at the time of exercise."[48] Romeo Systems did nothing to address the discrepancy and did not make any changes to its capitalization table.[49]

## D. The Promissory Note and Pledge Agreement

On February 10, 2017, Cannon asked Patterson for assistance in finding an attorney to handle a criminal matter unrelated to Romeo Systems.[50] Patterson referred Cannon to Barrie VanBrackle then at Orrick, stating: "She is my attorney and you can talk to her for free[.] I will cover it and then she can advise us both."[51] VanBrackle's then partner, Randy Luskey, recommended two criminal defense attorneys to Cannon, and Patterson agreed to loan Cannon $20,000, payable directly

---

[48] JX 96 at 2; Tr. 486:5–24 (Webb).

[49] Tr. 487:1–13 (Webb). Webb also personally identified the discrepancy between the terms of the Warrant and the Company's capitalization table, but did not address it. *Id*. at 482:3–14. In an August 11, 2018 internal memo to the "Romeo Power 2017 Audit File," the Company's auditor, Deloitte, wrote: "We have obtained the Cannon warrant agreement and it properly includes the 100,000 shares of Common Stock warrant . . . ." JX 97 at 3. The memo does not mention the discrepancy that KPMG had identified a month earlier. The version of the warrant referenced in Deloitte's memo is not in the record.

[50] PTO ¶ 40; JX 67 at 36.

[51] JX 70 at 1; *see* PTO ¶ 41.

13

to her criminal defense counsel in two $10,000 installments.[52] Patterson asked VanBrackle to memorialize the agreement and to "deliver [Cannon] a 1 year note where [s]he pledges [her] Romeo [Systems] shares to me if [s]he doesnt [*sic*] pay me back by 3/1/18."[53]

On March 2, 2017, VanBrackle, at Patterson's request, emailed to Patterson and Cannon a Promissory Note, dated March 1, 2017 (the "Promissory Note") and a Securities Pledge Agreement, dated March 2, 2017 ("Pledge Agreement").[54] The Pledge Agreement granted Patterson a first priority security interest in the "Pledged Assets," which are defined as "(a) a warrant to purchase Common Stock in the Issuer [Romeo Systems] for one million shares"; and "(b) all proceeds of any of the foregoing."[55] "The Pledged Assets secures the obligations of the Pledgor arising under, and evidenced by, a Promissory Note of even date to repay all amounts advanced by Secured Party to Pledgor's attorney by March 1, 2018 (the 'Obligations')."[56] The Pledge Agreement states that Patterson, as the Secured Party:

> may, after the occurrence and during the continuance of a default in the performance or observance of the Obligations, without notice and at

---

[52] PTO ¶¶ 42–43.

[53] *Id.* ¶ 44; JX 73 at 1.

[54] PTO ¶ 45; JX 77.

[55] JX 80 at 3.

[56] *Id.*

14

[his] option, transfer or register the Pledged Assets or any part thereof into [his] or [his] nominee's name with or without any indication that such Pledged Assets is subject to the lien created hereunder.[57]

The Pledge Agreement further provides:

> (b) The Secured Party shall have, in addition to any other rights given under this Agreement or any other document or by applicable law, all of the rights and remedies with respect to the Pledged Assets of a secured party under the Uniform Commercial Code as in effect from time to time in the State of Delaware. In addition, after the occurrence of a default in the performance or observance of the Obligations, the Secured Party shall have such powers of sale and other powers as may be conferred by applicable law. With respect to the Pledge Assets or any part thereof which shall then be in or shall thereafter come into the possession or custody of the Secured Party, or which the Secured Party shall otherwise have the ability to transfer under applicable law, the Secured Party may, in its sole discretion, without notice except as specified below [in subsection (c)] after the occurrence and during the continuance of a default . . . retain such Pledged Assets, or sell or cause the same to be sold at any exchange, broker's board or at public or private sale, in one or more sales or lots, at such price as the Secured Party may deem best, for cash or on credit for future delivery. . . .

> (c) Unless any of the Pledged Assets threatens to decline speedily in value or is or becomes of a type sold on a recognized market, the Secured Party will give the Pledgor reasonable notice of the time and place of any public sale thereof, or of the time after which any private sale or other intended disposition is to be made. Notwithstanding any provision to the contrary contained herein, the Pledgor agrees that any requirements of reasonable notice shall be met if such notice is received by the Pledgor as provided in [the notice provision] at least ten (10) days before the time of the sale or disposition; *provided*, that the Secured Party may give any shorter notice that is commercially reasonable under the circumstances. Any other requirement of notice,

---

[57] *Id*. at 5.

demand or advertisement for sale is waived, to the extent permitted by law.[58]

In addition, Cannon, as the Pledgor, agreed to "waive[] presentment and demand for payment of any of the Obligations, protest and notice of dishonor or the occurrence of any default with respect to any of the Obligations, and all other notices to which the Pledgor might otherwise be entitled, except as otherwise expressly provided herein."[59] The Pledge Agreement also contains an exculpatory provision.[60]

Cannon returned signed copies of the Promissory Note and Pledge Agreement on March 3, 2017, without requesting or making any changes to the draft agreements circulated by VanBrackle the previous day.[61] Upon receipt of the executed Promissory Note and Pledge Agreement, Patterson wired the first $10,000

---

[58] *Id*. All notices under the Pledge Agreement "shall be in writing and delivery thereof shall be deemed to have been made either (i) one day after such notice shall have been deposited with an internationally-recognized overnight courier service, or (ii) when delivered by hand or transmitted by facsimile transmission[.]" *Id*. at 7.

[59] *Id*. at 4.

[60] *Id*. ("The Secured Party shall not be liable for any acts, omissions, errors of judgment or mistakes of fact or law, including, without limitation, acts, omissions, errors or mistakes with respect to the Pledged Assets, except for those arising out of or in connection with such person's gross negligence or willful misconduct. Without limiting the generality of the foregoing, the Secured Party shall not be under any obligation to take any steps necessary to preserve rights in the Pledged Assets against any other parties."). The Pledge Agreement is expressly governed by Delaware law.

[61] PTO ¶¶ 45–46; *see* JX 79; JX 80. Patterson subsequently executed the Promissory Note and Pledge Agreement via DocuSign. JX 80; JX 306. The DocuSign email is dated November 16, 2018. JX 306. Patterson did not include his notice information in the executed version. *See* JX 80 at 7.

installment to Cannon's criminal defense counsel.[62]  On July 7, 2017, Cannon requested, via email, the second $10,000 installment from Patterson.[63]  In response, Patterson, copying Webb, stated:  "Lauren, Please confirm that [Cannon] has assigned me [her] shares and options/warrants([*sic*] whatever [s]he has in Romeo Power) as collateral and I will then initiate a wire from my personal acct."[64]  Cannon inquired:  "I think we're all set there, Lauren?"[65]  Webb responded:  "Confirmed. We have documentation of the stock pledged to Mike."[66]  Thereafter, Patterson wired the second $10,000 installment to Cannon's attorney.[67]

### E. Cannon Defaults on the Promissory Note; Patterson Transfers and Registers the Warrant in his Name.

The Promissory Note matured on March 1, 2018.[68]  Cannon did not repay any portion of the Promissory Note and defaulted.[69]  In November 2018, eight months after the Promissory Note matured, Romeo Systems, at Patterson's instruction, transferred the Warrant from Cannon to Patterson and registered the Warrant in

---

[62] PTO ¶ 47; *see* JX 82 at 3.

[63] JX 82 at 2.

[64] *Id*. at 1

[65] *Id*.

[66] *Id*.

[67] Tr. 238:18–239:2, 240:2–5 (Patterson).

[68] PTO ¶ 48; JX 80 at 1.

[69] *Id*. ¶ 49.

Patterson's name.[70]  Patterson did not provide notice of the transfer of the Warrant to Cannon, and Cannon did not provide her consent to the transfer.[71]

**F.      Romeo Systems Announces a Business Combination; Patterson Exercises the Warrant.**

On October 5, 2020, Romeo Systems publicly announced that it had entered into an Agreement and Plan of Merger (the "Merger Agreement") with RMG Acquisition Corp. ("RMG"), a special purpose acquisition company or "SPAC."[72] Upon consummating the transaction (the "Merger") Romeo Systems would survive as a wholly owned subsidiary of RMG, which would be renamed "Romeo Power, Inc," and stockholders of Romeo Systems would become stockholders of Romeo Power.[73]  The Merger was expected to close in December 2020.[74]

On October 27, 2020, Patterson exercised the Warrant and acquired 1,000,000 shares of Romeo Systems common stock.[75]  Around the same time, Cannon

---

[70] Tr. 233:10–13; 243:9–13 (Patterson); *id.* at 453:4–14 (Webb); PTO ¶ 50.

[71] Patterson Dep. at 134:3–6 ("Q.  Did you ever send Cannon any notice that you intended to foreclose on the collateral because the debt hadn't been repaid?  A.  No.  I don't think so."); Tr. 353–55 (Patterson) (acknowledging that Romeo Systems transferred the Warrant without providing notice to Cannon or obtaining her consent).

[72] PTO ¶ 55; JX 198.

[73] PTO ¶ 57.

[74] *Id*. at ¶ 55.

[75] *Id*. at ¶ 51; JX 117; JX 118.  Patterson paid an exercise price of $1,000 on December 17, 2020.  PTO ¶ 51; JX 144.  Romeo Systems registered Patterson as the owner of 1,000,000 shares of common stock.  JX 148 at "Warrants Report" tab, Row 53.

18

contacted her counsel, Indeglia, after reading a press release about the Merger and asked for his assistance with participating in the transaction.[76] On November 23, 2020, after reviewing the S-4 registration statement filed by RMG, Indeglia contacted the Company's deal counsel, Paul Hastings LLP ("Paul Hastings"), concerning the Warrant.[77] Indeglia's email stated:

> [Cannon] recently learned that Romeo [Systems] is being acquired in [*sic*] by a SPAC called RMG Acquisition Corp. [Cannon] has not heard from Romeo [Systems] regarding this transaction [and] would like to confirm her interests in Romeo [Systems]. There is no mention of [Cannon] in the joint S-4/Proxy filed by RMG, but it is possible that [Cannon's] interests are properly accounted for notwithstanding there being no mention of her in the S-4/Proxy.[78]

On November 27, 2020, David Hernand from Paul Hastings responded:

> I understand from Romeo Power's CFO that . . . Cannon was issued a warrant but subsequently borrowed money from Romeo Power CEO Mike Patterson and pledged [the] warrant as collateral. The loan was never repaid, and the warrant was transferred to Mr. Patterson in satisfaction of the loan amount. Accordingly, . . . Cannon no longer has an interest in such warrant. Please see the attached documents.[79]

---

[76] Tr. 39:17–41:1 (Indeglia).

[77] PTO ¶ 66; JX 132 at 3; Tr. 42:12–43:1 (Indeglia).

[78] JX 132 at 3. The S-4 represented: "A warrant for 1,000,000 shares of Class B common stock at $0.01 per share was transferred to Michael Patterson from a former employee after it was pledged as security for a loan." JX 116 at 235. Indeglia acknowledged this at trial, but testified that he "would have had no way of knowing" that that statement referred to the Warrant "at the time [he] wrote the email" to Paul Hastings. Tr. 93:17–94:9 (Indeglia). Indeglia's testimony is credible.

[79] PTO ¶ 67; JX 132 at 1.

Hernand attached to his email the Promissory Note, the Pledge Agreement, and "Proposed Resolutions of the Board of Directors of Romeo Systems, Inc." purporting to authorize the transfer of the Warrant from Cannon to Patterson.[80]

On November 30, 2020, Indeglia sent a series of follow-up questions, inquiring about "th[e] discrepancy" between the Warrant and the Pledge Agreement.[81] That same day, Hernand responded: "[I]t would be helpful to know what your client's position is with respect to the warrant. Does [Cannon] think that [s]he currently is entitled to anything? Does [s]he dispute that [s]he borrowed money, pledged h[er] warrant, failed to repay the loan? Let me know."[82] The next day, Indeglia sent an email outlining Cannon's position with respect to the Warrant.[83] Following Indeglia's December 1, 2020 email, Indeglia did not receive any further communications from Hernand or any other Romeo Systems attorney regarding the Warrant.[84]

---

[80] JX 129 at 6–51.

[81] JX 125 at 1; JX 132 at 1; *see* PTO ¶ 68. Indeglia also inquired about the status of the Warrant "[a]fter the foreclosure on the pledge." JX 125 at 1 ("[W]hat happened to the warrant? The proposed resolutions indicate that it was to be transferred to Mr. Patterson. Was it? If so, was it thereafter canceled? Exercised? Is it still outstanding?").

[82] JX 143 at 5.

[83] *Id.* at 1–2.

[84] Tr. 54:1–20 (Indeglia). Indeglia did not attempt to contact Patterson because Indeglia "assumed that contacting Romeo was the same as contacting him" because "he [wa]s the

20

Upon consummation of the Merger on December 29, 2020, the issued and outstanding shares of Romeo Systems common and preferred stock were converted into shares of Romeo Power stock. Romeo Power common stock began trading on the New York Stock Exchange under the ticker symbol "RMO."[85] The 1,000,000 shares of Romeo Systems common stock obtained by Patterson after exercising the Warrant were converted into 121,730 shares of Romeo Power common stock (the "Warrant Shares").[86] Romeo Power's shares traded at a high of $31.01 per share the day the Merger closed.[87] The following day, Romeo Power's shares traded at a high of $32.73 per share.[88]

As a condition to the Merger, certain Romeo Systems stockholders agreed to a lock-up period and were prohibited from selling or otherwise disposing of their Romeo Power common stock for 180 days after the closing of the Merger.[89]

---

largest shareholder and director." *Id.* at 54:21–55:4, 55:11–14. Additionally, Indeglia expressed concern about contacting Patterson: "[h]e would be represented by counsel . . . I'm not going to contact him when I know Paul Hastings is representing the company and, in all likelihood, him." *Id.* at 55:11–19.

[85] PTO ¶ 57; JX 200 at 12.

[86] PTO ¶ 52.

[87] *Id.* at ¶ 58.

[88] *Id.* at ¶ 59.

[89] JX 116 at 97–98, 110 ("Romeo [Systems]'s board of directors considered that, in connection with the execution of the Merger Agreement, certain Romeo [Systems] stockholders entered into an agreement with Romeo [Systems] and RMG, pursuant to

Patterson was subject to the lock-up and therefore could not trade his Romeo Power shares until June 28, 2021.[90] As of January 8, 2021, during the lock-up period, Patterson reported that he held 14,241,222 shares of Romeo Power common stock, including the Warrant Shares.[91] Once Patterson's lock-up period expired, he began to sell his shares of Romeo Power common stock.[92] On June 28, 2021, Patterson sold 2,612,399 shares of Romeo Power common stock in three tranches for total gross proceeds of $22,013,702.10. As of June 29, 2021, Patterson reported that he held 11,628,8234 shares of Romeo Power common stock, inclusive of the Warrant Shares.[93] Between June 29 and October 26, 2021, Patterson sold 9,560,000 shares of Romeo Power common stock for total gross proceeds of $47,660,756.[94]

---

which such stockholders have agreed to not sell or otherwise dispose of their RMG shares for 180 days after the date of closing of the [de-SPAC merger] (subject to certain exceptions).)"; *id.* at 577–582 (Form of Lock-Up Agreement); Tr. 464:5–12 (Webb) ("Q. [W]hat was your understanding of what would have happened if the required number or percentage of shares of legacy Romeo's security holder shares did not agree to the lockup? A. The deal would not have gone through. Q. As a result of that, were legacy Romeo security holders asked to sign lockup agreements? A. Yes.").

[90] *See* JX 204; *see also* Tr. 253:16–19 (Patterson); *id.* at 369:10–17; *id.* at 390:22–391:2; *id.* at 465:22–466:1 (Webb).

[91] PTO ¶ 60; JX 150 at 1.

[92] *See* PTO ¶¶ 61–63; JX 156 (Patterson's trade confirmations for himself and his family trust from June 21, 2021, through January 24, 2022)

[93] PTO ¶ 64; s*ee* JX 156.

[94] *See* JX 156.

### G. Commencement of the Litigation and Subsequent Events

Cannon filed her original complaint in this action on February 26, 2021, against Romeo Systems, Romeo Power (the "Romeo Defendants"), and Patterson (together with the Romeo Defendants "Defendants").[95] Cannon filed an amended complaint in October 2021, to which Defendants filed answers.[96] On March 10, 2022, the Romeo Defendants filed an amended answer and asserted a counterclaim against Cannon.[97] Shortly thereafter, while the parties were engaged in written discovery, Patterson's counsel sent a letter to Cannon titled: "Notification of Disposition of Collateral."[98] The letter stated Patterson intended to sell the Warrant Shares, and Cannon was "entitled to an accounting to the unpaid indebtedness."[99] In addition, the letter stated Cannon "may redeem the collateral" by "tender[ing] fulfillment of all obligations secured by the collateral including payment of the debt, interest and reasonable attorney's fees."[100]

Indeglia responded on April 8, 2022. Indeglia disputed that Patterson was holding the Warrant Shares as collateral, noting that this was inconsistent with

---

[95] Dkt. 1.

[96] *See* Dkts. 51, 53, 54.

[97] Dkt. 69.

[98] *See* JX 166.

[99] *Id.* at 1.

[100] *Id.* at 2.

Patterson's representation to the Romeo Systems Board that "the transfer of the Warrant to Mr. Patterson was in satisfaction of Ms. Cannon's obligations under the note."[101] He noted that it was also inconsistent with Patterson's and Romeo Power's SEC filings, which "include the [Warrant] shares as part of Mr. Patterson's record and beneficial ownership of RMO, with no disclosure, notation, or other indication that he was holding the [Warrant] Shares in name only as a secured party, with Ms. Cannon remaining the beneficial owner of such shares."[102] Indeglia also noted that Patterson had sold at least 13,431,907 shares of Romeo Power since June 28, 2021, and "[g]iven that the [Warrant] Shares were commingled with Mr. Patterson's other shareholdings, it is not clear . . . that Mr. Patterson has not already sold the [Warrant] Shares."[103]

On May 16, 2022, Patterson's counsel sent a letter to Indeglia representing that Patterson had sold all 121,730 Warrant Shares "on a public exchange on May 3, 2022, at a price per share of $1.1585," generating $141,023.49 in proceeds.[104] The letter further stated that, after deducting for "reasonable attorney fees and expenses totaling $6,476.25 and satisfying the debt of $20,000 and accrued but unpaid interest

---

[101] JX. 167 at 2.
[102] *Id.*
[103] *Id.*
[104] JX 169.

of $5,745," there remained $108,802.24 for Cannon.[105] Patterson later transmitted this amount to Cannon.[106] Notably, however, Patterson has presented no admissible evidence to substantiate that he sold any shares of Romeo Power stock on May 3, 2022, let alone the Warrant Shares.[107]

On October 14, 2022, Romeo Power was acquired by Nikola Corporation ("Nikola").[108] On July 3, 2023, Nikola announced that it had initiated the liquidation of Romeo Power pursuant to an assignment for the benefit of creditors, and SG

---

[105] *Id.*

[106] The total was delivered in two separate payments. First was a wire transfer to Indeglia's trust account for the benefit of Cannon. *See* 7/27/22 Cannon Dep. at 425:17–21. The remaining $8,000 was sent to Cannon in the form of a check drawn on Patterson's counsel's account. In a cover letter with the check, Patterson's counsel indicated that the initial wire transfer was $8,000 light. JX 191.

[107] Cannon objects to the admissibility of JX 166, JX 169, and JX 191 as inadmissible hearsay to the extent Defendants rely on these documents as evidence of Patterson's sale of the Warrant Shares or that he was holding shares as collateral at that time. *See* Tr. 96:8–15, 152:23–153:4, 732:2–11 (allowing standing evidentiary objection at trial and permitting parties to address objections in post-trial briefing); *see* Dkt. 233 Ex. A ¶ 58 n.5; Pl.'s Opening Br. 23 n.17. The court agrees, and Patterson has not offered any persuasive argument to support their admissibility as evidence of the stock sales. Even if these letters were admissible, they are not persuasive. "[I]f the record lacks documentation relating to a particular event, and if it is reasonable to expect that documentation would exist if the event took place, then the [moving party] [is] entitled to a reasonable inference that the event did not occur." *Ont. Prov. Council of Carpenters' Pension Tr. Fund v. Walton*, 2023 WL 3093500, at *2 (Del. Ch. Apr. 26, 2023). On the other hand, Plaintiff does not dispute that the $108,802.24 payment from Patterson to Cannon can be considered in offsetting the total damages award. *See* Pl.'s Opening Br. at 50; Post Tr. Arg. Tr. at 50:14–22.

[108] PTO ¶ 69.

25

Service Co., LLC, as assignee, succeeded to all of Romeo Power's right, title, and interest in its assets as of June 30, 2023.[109]

## H.    Procedural History

Plaintiff's original complaint asserted four counts.  Count I asserted a claim for declaratory judgment against the Defendants.  Count II asserted a claim for non-compliance with Article Nine of the Uniform Commercial Code ("UCC"), as adopted in Delaware, against Patterson.  Count III asserted a claim for conversion against the Defendants.  Count IV asserted a claim for breach of contract against the Romeo Defendants.

On May 4, 2021, Patterson filed an answer to the complaint and asserted affirmative defenses, and the Romeo Defendants filed a motion to dismiss the claims against them under Court of Chancery Rule 12(b)(6).[110]  Following briefing,[111] the court granted the motion to dismiss Count III of the complaint as to the Romeo

---

[109] PTO ¶¶ 70–71.  Romeo Power became void in March 2024.  *See Swift v. Hous. Wire & Cable Co.*, 2021 WL 5763903, at *2 n.14 (Del. Ch. Dec. 3, 2021) (explaining the court may take judicial notice of filings with the Delaware Secretary of State); D.R.E. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *id.* at 201(c)–(d) ("The court . . . may take judicial notice on its own . . . at any stage of the proceeding.").

[110] Dkts. 21–22.

[111] Dkts. 25, 32, 34.

Defendants, but otherwise denied the motion.[112] Thereafter, Plaintiff filed an amended complaint (the "Amended Complaint").[113] The Amended Complaint added a fifth claim for wrongful registration of securities under the UCC against the Romeo Defendants.[114] The Amended Complaint is the operative complaint in this action.

On October 28, 2021, Patterson and the Romeo Defendants filed their answers to the Amended Complaint and asserted affirmative defenses.[115] On March 10, 2022, the Romeo Defendants filed an amended answer and affirmative defenses, and counterclaims.[116] On April 21, 2022, in response to Plaintiff's motion to dismiss and motion to strike the counterclaims, the Romeo Defendants filed amended counterclaims (the "Amended Counterclaims") for fraudulent inducement, fraudulent concealment, and declaratory judgment.[117] On May 12, 2022, Plaintiff filed a motion to dismiss the Amended Counterclaims under Rule 12(b)(6).[118] On

---

[112] Dkts. 46–47. On May 17, 2021, Plaintiff filed a motion for partial summary judgment. Dkt. 23. Plaintiff withdrew this motion following the court's rulings on Romeo Power and Romeo Systems's motion to dismiss. Dkt. 50 ¶ 1.

[113] Dkt. 51.

[114] *Id.* at ¶¶ 85–93.

[115] Dkts. 53–54.

[116] Dkt. 69.

[117] Dkts. 75–76.

[118] Dkt. 81.

27

November 21, 2022, Plaintiff filed a motion to strike the Defendants' three expert reports as untimely and improper.[119]  Following briefing on both motions,[120] the court granted the motion to dismiss the Amended Counterclaims for fraudulent inducement and fraudulent concealment, and denied the motion to strike without prejudice.[121]

On August 11, 2023, following Nikola's liquidation of Romeo Power, counsel to the Romeo Defendants filed a motion to withdraw, which the court granted on August 14, 2023.[122]  Both entities remain unrepresented.  On October 4, 2023, Plaintiff filed a motion for entry of default judgment against the Romeo Defendants with respect to Count IV and Count V of the Amended Complaint, and for dismissal of the Romeo Defendants' remaining counterclaim for declaratory judgment.[123]  On October 20, 2023, the court granted Plaintiff's motion for default judgment against the Romeo Defendants, deferring the issue of damages until trial.[124]  The case against

---

[119] Dkt. 127.

[120] Dkts. 89, 98, 139, 141.

[121] Dkts. 144–46.

[122] Dkts. 165–66.

[123] Dkt. 169.

[124] Dkt. 178.

Patterson proceeded through trial, post-trial briefing, argument, and post-argument submissions.[125]

## II.    ANALYSIS

### A.    Standard of Review

Plaintiff asserts three claims against Patterson in the Amended Complaint: a claim for declaratory judgment (Count I), a claim for non-compliance with the UCC (Count II), and a claim for conversion (Count III). To succeed at trial, Plaintiff must prove each element of each of her claims by a preponderance of the evidence. *S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *15 (Del. Ch. Mar. 15, 2017), *aff'd*, 177 A.3d 610 (Del. 2017) (TABLE). "This standard of proof requires that the evidence shows that something is more likely than not." *Malkani v. Cunningham*, 2023 WL 1383938, at *6 (Del. Ch. Jan. 31, 2023), *aff'd sub nom.*, *TruthMD, LLC v. Malkani*, 341 A.3d 507 (Del. 2025) (TABLE).

### B.    An Adverse Inference Against Cannon is Not Warranted.

Before turning to the merits, the court addresses Patterson's request for an adverse inference against Cannon because she did not testify at trial. Patterson argues that "Cannon's failure to provide her own account of contested events [at

---

[125] Dkts. 242–44, 248, 250–51, 253.

trial] warrants a negative inference."[126] Cannon argues that it would be inappropriate for the court to draw an adverse inference regarding Cannon's subjective intent concerning the Warrant or the Pledge Agreement because the signed contracts are in the trial record.[127]

"It is a well established principle that the production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse." *Smith v. Van Gorkom*, 488 A.2d 858, 878 (Del. 1985), *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695 (Del. 2009); *accord Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1118 n.7 (Del. 1994); *Young v. Red Clay Consol. Sch. Dist.*, 159 A.3d 713, 791 n.510 (Del. Ch. 2017); *Chesapeake Corp. v. Shore*, 771 A.2d 293, 300–01 & n.7 (Del. Ch. 2000); *Walton*, 2023 WL 3093500, at *2.

---

[126] Def.'s Answering Br. 23. At trial, Patterson moved for judgment as a matter of law after Cannon concluded her case in chief. Tr. 507:9–24. The court took the matter under advisement and directed Patterson to address it in his post-trial briefing. Tr. 508:5–6. In his post-trial answering brief, Patterson asks the court to draw an adverse inference against Cannon. Patterson has not argued that he is entitled to judgment as a matter of law. The court considers this request to have been abandoned. *See King v. VeriFone Hldgs., Inc.*, 994 A.2d 354, 360 n.21 (Del. Ch. 2010) ("A party's failure to raise an argument in its answering brief constitutes a waiver of that argument."), *rev'd on other grounds*, 12 A.3d 1140 (Del. 2011); *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."); *MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at *16 & n.190 (Del. Ch. May 10, 2018) (treating claims not briefed as abandoned).

[127] Pl.'s Reply Br. 5–6.

"The federal courts follow the 'uncalled witness' rule, which states that 'if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.'" *Restanca, LLC v. House of Lithium, Ltd.*, 2023 WL 4306074, at \*16 (Del. Ch. June 30, 2023) (quoting *Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1046 (5th Cir. 1990)), *aff'd*, 328 A.3d 328 (Del. 2024) (TABLE). This rule "permits, rather than compels, the factfinder to draw an adverse inference from the absence of a witness, . . . particularly where the factfinder concludes that the party who requested the adverse inference failed to subpoena a witness otherwise available to testify." *Id.* (alteration in original) (quoting *Bogosian v. Woloohojian Realty Corp.*, 323 F.3d 55, 67 (1st Cir. 2003)).

Patterson does not engage with this case law in his briefing. Patterson could have but chose not to call Cannon to testify at trial. Patterson's counsel conceded this at post-trial argument.[128] "An adverse inference is not warranted . . . where the controlling or related party makes the missing witness available to its opponent, the party seeking the adverse inference equally could obtain the missing witness's testimony, or the party seeking the adverse inference made no attempt to obtain the witness's testimony." *Chevron Corp. v. Donziger*, 974 F.Supp.2d 362, 701

---

[128] Post-Trial Arg. 71:19–72:14.

(S.D.N.Y. 2014). Accordingly, the court declines to draw an adverse inference from Cannon not testifying at trial.

## C. The Warrant is Valid and Enforceable for One Percent of the Company's Common Stock at the Time of Exercise.

The court first addresses the validity of the Warrant.[129] Under Delaware law, "a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). The parties' dispute focuses on the first element. Cannon argues that the Warrant is valid and enforceable as a fixed-percentage warrant at the time of exercise because the Warrant expressly says so, and both parties executed the

---

[129] Cannon contends that Patterson lacks legal standing to challenge the validity of the Warrant as a nonparty to the contract. Pl.'s Opening Br. 27. "As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions." *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007); *see Kronenberg v. Katz*, 872 A.2d 568, 605 n.74 (Del. Ch. 2004) ("Of course, a nonparty to a contract ordinarily has no rights under that contract. The exception is when the nonparty can demonstrate that it was a third-party beneficiary of the contract."). Under these principles, the court questions whether Patterson has legal standing to challenge the validity of the Warrant. Patterson does not argue he is a third-party beneficiary of the contract. That being said, the court, in denying Patterson's pretrial motion to amend his answer, permitted him to raise these issues in the context of challenging Cannon's efforts to prove her claims. Dkt. 220 at 20:15–18. So, the court considers Patterson's arguments solely for that purpose. Either way, the court concludes the Warrant is valid and enforceable.

Warrant.[130]  Patterson insists that there was no meeting of the minds between Cannon and Romeo Systems for a fixed-percentage warrant.[131]

"Whether a party manifested an intent to be bound is a question of fact." *Eagle Force Hldgs., LLC v. Campbell*, 235 A.3d 727, 735 (Del. 2020).  "[O]vert manifestation of assent—not subjective intent—controls the formation of a contract. Whether both of the parties manifested an intent to be bound is to be determined objectively based upon their expressed words and deeds as manifested at the time rather than by their after-the-fact professed subjective intent."  *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at \*12 (Del. Ch. Sept. 30, 2014) (citation modified).

Patterson executed the Warrant on the Company's behalf.[132]  That act alone is the strongest evidence of an intent to be bound.  "[W]here the putative contract is in the form of a signed writing, that document generally offers the most powerful and persuasive evidence of the parties' intent to be bound."  *Eagle Force*, 187 A.3d at

---

[130] Pl.'s Opening Br. 28–32.

[131] Def.'s Answering Br. 50–57.

[132] Patterson testified at trial that the Warrant "was never executed."  Tr. 340:11–12 (Patterson).  This testimony is not credible and contradicts the facts stipulated by the parties and the contemporaneous documentary evidence.  *See* PTO ¶¶ 25, 27 (stipulating Patterson countersigned the signature page to the Warrant); JX 36 at 2 (Patterson's executed signature page to the Warrant); *see also* JX 302–05 (Patterson re-executing the Warrant on July 18, 2018, via DocuSign, in response to a request from Webb).  Patterson's counsel also acknowledged at post-trial argument that the Warrant was signed by both Cannon and Patterson.  Post-Trial Arg. 104:23, 111:14.

1230. "When presented with a facially valid contract, the court will defer to the parties' signed writing unless there is evidence to the contrary." *Restanca*, 2023 WL 4306074, at *18 (citing *Malkani*, 2023 WL 1383938, at *8). The court "may consider evidence of the parties' prior or contemporaneous agreements and negotiations in evaluating whether the parties intended to be bound by the agreement." *Eagle Force*, 187 A.3d at 1230.

The evidence of negotiations leading up to the signing of the Warrant is limited. On August 19, 2015, Cannon and Patterson agreed to resolve the payment dispute under the Consulting Agreement. Patterson, on behalf of Romeo Systems, and Cannon memorialized that arrangement and executed the Release. Pursuant to the Release, Cannon agreed to release her claims in exchange for the payment of $13,000 and "a document(s) or stock certificates guaranteeing [her] 1%, 'full ratchet' non-dilatable [*sic*], shares of Romeo Systems [], the owner of the [Romeo Systems] Patent that CANNON worked on while working with the company, to be issued to CANNON no later than Aug 31, 2015."[133]

On August 31, 2015, Patterson emailed Cannon the Draft Warrant.[134] He stated in his email: "Basically a warrant for up to 1% . . . exercise price of .01

---

[133] JX 16.

[134] JX 23 at 1.

(practically free)."[135]  The only contemporaneous documentary evidence in the record is the exchange of emails between Cannon and Patterson on August 31, 2015, and from December 25–28, 2015.[136]  There is no persuasive evidence that Cannon and Patterson had any other communications about the Warrant during this time.[137]  On December 25, 2015, Cannon sent the Warrant with her signature page to Patterson.[138]  Two days later, on December 27, 2015, Patterson responded that he would "print and return from the office tomorrow."[139]  The next day, Patterson emailed Cannon his executed signature page on behalf of the Company.  His email stated:  "You are recorded as of today."[140]  Patterson argues that the phrase "recorded

---

[135] *Id.* (alteration in original).

[136] JX 23; JX 34; JX 35; JX 36.

[137] Cannon testified at her deposition that she had some type of correspondence with Patterson between August 30 and December 24, 2015, regarding the Draft Warrant. 7/26/22 Cannon Dep. at 225–29.  This testimony is not credible.  Cannon could not recall the form of the communications or when those communications occurred.  Further, Cannon could not recall any specific written communications between her and Patterson.  There is no contemporaneous documentary evidence that Cannon and Patterson had any discussions regarding the Warrant during this time.

[138] JX 34.

[139] JX 35.

[140] JX 36 at 1.  At trial, Patterson testified that he did not personally document the Warrant on December 28, 2015.  He believed that an attorney did.  Tr. 206:8–11 (Patterson) ("Q.  So did you record the warrant in Romeo[] [Systems's] books?  A.  No, I believe another attorney -- an attorney did.").  Based on the evidence in the trial record, Webb recorded the Warrant at some point between December 2016 and February 2017 when she was preparing a comprehensive capitalization table for the Company.  *Id.* at 404:24–406:6 (Webb).  The

35

as of today" "only makes sense" if the agreement was for a fixed-share warrant, not a fixed percentage warrant.[141]  The court finds otherwise, because the parties' "overt manifestation of assent, not a subjective intent, controls the formation of a contract." *Acierno v. Worthy Bros. Pipeline Corp.*, 693 A.2d 1066, 1070 (Del. 1997).  Patterson overtly manifested the Company's intent when he signed the Warrant on its behalf. "By signing the agreement, [Patterson] w[as] [] indicating [Romeo Systems's] intent to be bound by its terms."  *Kirkwood Motors, Inc. v. Conomon*, 2001 WL 112054, at *2 (Del. Super. Feb. 5, 2001); *see Osborn*, 991 A.2d at 1158–59 ("The face of th[e] [Warrant] manifests the parties' intent to bind one another contractually."). Patterson's extrinsic evidence is not sufficient to displace the clear language of a facially valid agreement executed by a sophisticated senior executive with sole authority to bind the Company.

Patterson's lament that he mistakenly believed he was signing the Draft Warrant[142] is of no moment.

---

Company did not have a formal capitalization table or a warrant registry in 2015.  *Id.* at 403:24–404:6; *id.* at 704:2–9 (Kuehne) ("Q.  And you're not aware of Romeo having any cap table for the period ending December 2015, are you?  A.  I have not seen one.  Q. You do know that the 2015 Cannon [W]arrant was not recorded on Romeo[] [System's] cap table until 2017; correct?  A.  I know that it was recorded later . . ."); *see also* Def.'s Answering Br. 52 n. 19 (acknowledging Romeo Systems "did not have a formal stock register or capitalization table in 2015").

[141] Def.'s Answering Br. 52.

[142] *Id.* at 56.

> When an experienced party does not bother to read what he knows will be the binding agreement, a court must be exceedingly careful before allowing him to escape the consequences of that agreement, lest the court undercut the reliability of all written contracts, a reliability critical to their important role in facilitating useful commercial relations.

*Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 711 (Del. 2019). "'[F]ailure to read a contract provides no defense against enforcement of its provisions where the mistake sought to be avoided is unilateral and could have been deterred by the simple, prudent act of reading the contract.'" *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2009 WL 3247992, at *4 n.19 (Del. Ch. Oct. 6, 2009) (quoting 27 *Williston on Contracts* § 70.113 (4th ed. 2009)), *aff'd*, 985 A.2d 391 (Del. 2009) (TABLE); *UBEO Hldgs., LLC v. Drakulic*, 2021 WL 1716966, at *10 (Del. Ch. Apr. 30, 2021) ("[I]f a party to a contract could use her failure to read a contract as a way to circumvent her obligations, contracts would not be worth the paper on which they are written." (citation modified)). Under Delaware law, "a party's failure to read a contract [cannot] justify its avoidance." *Harrington Raceway, Inc. v. Vautrin*, 2001 WL 1456873, at *3 (Del. Super. Aug. 31, 2001) (alteration in original) (quoting *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 477 (Del. 1991)); *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 677 (Del. 2013) ("[A] failure to read bars a party from seeking to avoid or rescind a contract.").

Patterson was not only a sophisticated party, he was also the CEO and sole director of Romeo Systems, which had outside counsel that initially drafted the

Warrant. Patterson cannot now rely on his failure to read the Warrant as grounds to invalidate the agreement. He admits that he had the opportunity to review the Warrant before he signed it,[143] but he chose not to do so.[144] Even a cursory review would have revealed the differences from the Draft Warrant. For instance, the change from "Issuance Date" to "Exercise Date" was marked in bold at the top of the first page of the Warrant. A half page of defined terms was added in Section 1(a). The changes were plain from the face of the document.[145] Patterson could have asked Cannon if she had made any revisions to the Draft Warrant, and he could have asked Cannon to supply a redline. He also could have performed his own redline or asked someone at Romeo Systems or the lawyers at Wilson Sonsini who prepared the Draft Warrant to compare the documents. He chose none of those options. "Ultimately, [Patterson's] predicament is one of [his] own making and could easily have been avoided. The court will not unwind a transaction due to a sophisticated party's decision to sign an agreement without having read it." *Braga Inv. & Advisory, LLC v. Yenni*, 2023 WL 3736879, at *15 (Del. Ch. May 31, 2023).

---

[143] Tr. 314:21–315:2, 373:16–374:4 (Patterson).

[144] *Id.* at 203:13–14, 315:3–5.

[145] Patterson's testimony that the changes to the Draft Warrant were "not apparent" strains credulity. *Id*. at 202:18–23 ("Q. Did you realize when you received this email on Christmas Day that the attachment was different than what you sent on the 31st? A. I did not. If you put both documents on a table and you look at them, right, there's very, very minor changes, right? It's not apparent. . . .").

Patterson says *Kotler v. Shipman Associates, LLC*, 2019 WL 4025634 (Del. Ch. Aug. 21, 2019), allows him to avoid the Warrant Agreement, [146] but the facts of that case are materially different from those here. In *Kotler*, a company consultant slipped in the CEO's executed signature page to the plaintiff's changed version of a warrant agreement, which the plaintiff never provided to the company. *Id.* at *10, *17. That is the inverse of this case. Cannon provided Patterson with the entire agreement on December 25, 2015, along with her executed signature page. Patterson had access to all of the terms of the contract. He then signed the agreement three days later. [147] Unlike in *Kotler*, Cannon is not asking the court to enforce anything

---

[146] Def.'s Answering Br. 50–51.

[147] The other cases cited by Patterson in his briefing are also distinguishable. *See Tecot Elec. Supply Co. v. Skipper's Elec., Inc.*, 2009 WL 51551, at *3 (Del. Com. Pl. Jan. 9, 2009) (finding that there was no meeting of the mind between the parties "regarding the essential terms of price and design specifications for the control center" and concluding there was no enforceable oral contract to sell the control center); *Stenta v. Gen. Motors Corp.*, 2008 WL 4194002, at *4–*5 (Del. Super. Aug. 29, 2008) (finding there was no meeting of the minds where two signed agreements between the parties contradicted one another and concluding both agreements were unenforceable); *Limestone Realty Co. v. Town & Country Fine Furniture & Carpeting, Inc.*, 256 A.2d 676, 679–80 (Del. Ch. 1969) (finding there was no meeting of the minds where the offeror lacked authority to act on behalf of principal and the offeree failed to "exercise [] reasonable prudence" to determine scope of offeror's authority before accepting offer and signing release and "should have known [the offer] was unintended" based on the circumstances); *Sutherland v. Sutherland*, 28 A.3d 1093, 1101 (Del. Fam. 2010) (finding there was no meeting of the minds to exclude home from marital property to be divided between parties in divorce proceedings where signed quitclaim deed "failed to contain an understanding of each of the parties to exhibit a common mind and understanding concerning the effect of the documents" and "neither party, given the considerable stress at that time of a failing marriage and business, with creditors knocking at the door, had the mindset to have a full understanding of the consequences of what they were executing").

other than the full agreement that Patterson executed on behalf of Romeo Systems. Therefore, Patterson and the Company are bound by the agreement they signed.

Patterson also argues that the Warrant is invalid and unenforceable because the Board never authorized a fixed-percentage warrant at the time of exercise pursuant to Section 157 of the Delaware General Corporation Law ("DGCL").[148] He points to the Board resolution in February 2017 that ratified a warrant to Cannon for 100,000 shares pre-stock split.[149]

> Section 157 permits a corporation to:
>
> create and issue, whether or not in connection with the issue and sale of any shares of stock or other securities of the corporation, rights or options entitling the holders thereof to acquire from the corporation any shares of its capital stock of any class or classes of the corporation.

8 *Del. C.* § 157(a).

> Rights and options may be issued in 1 or more transactions, in the numbers, at the times and for the consideration as set forth in a resolution of the board of directors. The terms upon which, including the time or times which may be limited or unlimited in duration, at or within which, and the consideration for which any such shares may be acquired from the corporation upon the exercise of any such right or option, shall be as stated in the certificate of incorporation, or in a resolution of the board of directors.

---

[148] Def.'s Answering Br. 48–50.

[149] JX 66 at 2.

*Id.* § 157(b).[150]

[150] Section 157 was amended by the Delaware General Assembly in 2015, 2022, and 2023. *See* Robert S. Saunders et al., *Folk on Delaware General Corporation Law* § 157.13 (7th ed. 2024-3 Supp). The statute, effective as of August 1, 2015, provided as follows:

> (a) Subject to any provisions in the certificate of incorporation, every corporation may create and issue, whether or not in connection with the issue and sale of any shares of stock or other securities of the corporation, rights or options entitling the holders thereof to acquire from the corporation any shares of its capital stock of any class or classes, such rights or options to be evidenced by or in such instrument or instruments as shall be approved by the board of directors.

> (b) The terms upon which, including the time or times which may be limited or unlimited in duration, at or within which, and the consideration (including a formula by which such consideration may be determined) for which any such shares may be acquired from the corporation upon the exercise of any such right or option, shall be such as shall be stated in the certificate of incorporation, or in a resolution adopted by the board of directors providing for the creation and issue of such rights or options, and, in every case, shall be set forth or incorporated by reference in the instrument or instruments evidencing such rights or options. A formula by which such consideration may be determined may include or be made dependent upon facts ascertainable outside the formula, provided the manner in which such facts shall operate upon the formula is clearly and expressly set forth in the formula or in the resolution approving the formula. In the absence of actual fraud in the transaction, the judgment of the directors as to the consideration for the issuance of such rights or options and the sufficiency thereof shall be conclusive.

8 *Del. C.* 157(a)–(b) (2015). In the 2015 amendments, the General Assembly amended subsection (b) to clarify that, if a formula is used to determine consideration, it "may include reference to or be made dependent upon the operation of extrinsic facts, such as market prices on one or more dates, or averages of market prices on one or more dates." *Folk on Delaware Corporation Law* § 157.13 at 5–118. The statute otherwise remained unchanged from the prior version. *See id.*

Patterson was the Company's only director at the time he executed the Warrant in December 2015.[151] Patterson seeks to evade that obvious factual reality by positing "the number of board directors does not change the importance of the written board approval requirement."[152] He relies primarily on the Delaware Supreme Court's decision in *Grimes v. Alteon, Inc.*, 804 A.2d 256 (Del. 2002).[153] In *Grimes*, the Supreme Court concluded that an oral agreement between a corporation's CEO and a stockholder for the sale and purchase of future stock of the corporation was a "right" under Section 157. 804 A.2d at 258, 265. The Court held that the parties' oral agreement was invalid since it was not approved by the corporation's board of directors nor in writing as required by Section 271. *Id.* at

---

[151] Tr. 386:2–387:3 (Patterson); *id.* at 481:3–16 (Webb) ("My recollection is that at the earliest point in the company's history, the board was just Mike."); Webb Dep. 30:1–13 (testifying that Patterson "was the company" as of December 29, 2015). Patterson claimed his daughter was on the Board in 2015, but then backpedaled when he was confronted with a copy of Romeo Systems's annual franchise tax report that listed him as the sole director. Tr. 286:24–287:2, 288:1–2, 386–87 (Patterson). Patterson's daughter was not identified as a director on Romeo Systems's tax documents until 2016. *Id.* at 387:15–18. Webb's testimony is credible on this point; Patterson's was not. There is no documentary evidence to support Patterson's testimony that the Board comprised more than one director in 2015.

[152] Def.'s Answering Br. 50.

[153] The other cases cited by Patterson deal with veil piercing and alter ego issues and are inapposite. *See Midland Interiors, Inc. v. Burleigh*, 2006 WL 4782237, at *4, *6 (Del. Ch. Dec. 19, 2006) (granting post-trial judgment creditor's claim to pierce the corporate veil of debtor corporation to reach assets of the sole stockholder-employee of the debtor); *Case Fin., Inc. v. Alden*, 2009 WL 2581873, at *4–5 (Del. Ch. Aug. 21, 2009) (concluding post-trial that plaintiff had standing to bring direct claims against former director and officer but rejecting argument that plaintiff, a holding company, is alter ego of its operating subsidiary).

42

258; *id.* at 266 ("We agree with the conclusion of the Court of Chancery that the Grimes agreement is unenforceable for lack of both board approval and a written agreement.").[154] That is not the case here. The Warrant was a written instrument signed by Patterson, who was Romeo Systems's CEO and sole director. Patterson had sole authority to take board action by written consent in lieu of a meeting. *See* 8 *Del. C.* § 141(f) ("Unless otherwise restricted by the certificate of incorporation or bylaws, [] any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting if all members of the board or committee, as the case may be, consent thereto in writing, or by electronic transmission[.]").[155] Based on the facts and circumstances of this case, and the evidence presented at trial, the court concludes that Patterson's execution of the Warrant as Romeo Systems's CEO and sole director satisfies the requirements of Section 157. *See Feldman v. Cutaia*, 956 A.2d 644, 662 n. 67 (Del. Ch. 2007) ("While airtight written documentation of a resolution granting options is

---

[154] See *Grimes v. Alteon, Inc.*, C.A. No. 18442, at 62:20–63:7 (Del. Ch. Apr. 11, 2001) (TRANSCRIPT) ("[W]hat we have here is clearly a right that is subject to Section 157, which requires that the board of directors approve and put in writing or cause to be put in writing the agreement providing for the sale or issuance by the company of those rights. That was not done here, and the fact that it was not done is not disputed. For that reason, I conclude that the contract allegedly entered into between the [stockholder] and the corporation, even if valid as a matter of common law, is not valid under Section 157, and therefore does not give rise to any enforceable right."), *aff'd*, 804 A.2d 256 (Del. 2002).

[155] Romeo Systems's certificate of incorporation contains no such restrictions. *See* JX 4.

a prudent course of action for directors who wish to avoid future legal challenges, section 157(b) does not expressly require that the resolution be included in the minutes of the board meeting at which it was adopted or that the resolution be in writing."), *aff'd*, 951 A.2d 727 (Del. 2008); *see also Carriage Realty P'ship v. All-Tech Auto Auto., Inc.*, 2001 WL 1526301, at *7 (Del. Ch. Nov. 27, 2001) ("An individual who serves as President, sole director, and sole shareholder of a corporation cannot cause that corporation to deny the validity of an action he took on its behalf on the grounds that he lacked corporate authority.").[156]

Patterson also argues that Cannon waived, or alternatively, is estopped to claim any right to a "1%-at-exercise" Warrant.[157] "Waiver is the voluntary and intentional relinquishment of a known right. It implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those [] rights." *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005); *accord Bantum v. New Castle Cty. Vo-Tech Educ. Ass'n*, 21 A.3d 44, 50 (Del. 2011) ("It is well settled in Delaware that a party may waive her

---

[156] There is also no dispute that in February 2017, the Board, then a multi-member board comprised of five directors, acted via unanimous written consent to authorize the issuance of the Warrant. JX 66 at 2. The resolution stated the Board "failed to document the authorization of the Warrant at the time that the issuance of the Warrant was made" and "all prior and future actions taken by the officers of the Company to effectuate the Warrant, including any amendments thereto, are hereby ratified and approved." *Id*.

[157] Def.'s Answering Br. 58.

rights."). A party claiming waiver must show three elements: "(1) there must be a requirement or condition to be waived, (2) the waiving party must know of the requirement or condition, and (3) the waiving party must intend to waive that requirement or condition." *CSC Upshot Ventures I, L.P. v. Gandhi-Kapoor*, 326 A.3d 369, 369 (Del. 2024) (TABLE).

Patterson argues that "[t]he Pledge Agreement and Cannon's sworn discovery responses manifest her intent to pledge her one-million-share Warrant to Patterson," and "Cannon's statements are sufficient to constitute a waiver of any argument that the Warrant entitled the holder to more than one million shares."[158] The court disagrees. "[T]he standards for proving waiver under Delaware law are 'quite exacting. . . . [T]he facts relied upon to prove waiver must be unequivocal.'" *Bantum*, 21 A.3d at 50 (quoting *Am. Fam. Mortg. Corp. v. Acierno*, 640 A.2d 655, 655 (Del. 1994) (TABLE)); *see also Eureka VIII LLC v. Niagara Falls Hldgs. LLC*, 899 A.2d 95, 109 (Del. Ch. 2006) (noting that waiver must be proven with "clear and convincing evidence"). Patterson has failed to meet the high burden to

---

[158] *Id*. at 58–59.

demonstrate that Cannon intended to relinquish her rights.[159]  There is no persuasive

evidence that Cannon disclaimed the express terms of the Warrant.

Patterson's estoppel argument is also unpersuasive.  "The doctrine of

equitable estoppel is invoked 'when a party by his conduct intentionally or

unintentionally leads another, in reliance upon that conduct, to change position to

his detriment.'" *Nevins v. Bryan*, 885 A.2d 233, 249 (Del. Ch. 2005) (quoting *Wilson

v. Am. Ins. Co.*, 209 A.2d 902, 903–04 (Del. 1965)), *aff'd*, 884 A.2d 512 (Del. 2005)

(TABLE).  The party claiming estoppel must demonstrate that: "(i) they lacked

knowledge or the means of obtaining knowledge of the truth of the facts in question;

(ii) they reasonably relied on the conduct of the party against whom estoppel is

claimed; and (iii) they suffered a prejudicial change of position as a result of their

reliance." *Id.*  "Regardless of the form of the action, the burden of proof of estoppel

rests upon the party asserting it.  Furthermore, equitable estoppel must be proven by

clear and convincing evidence . . . ." *Id.*  Here, Cannon and Patterson's signatures

manifested an intent to be bound to the terms of the Warrant.  As Patterson himself

---

[159] To the extent Patterson argues that the court should rely on the Pledge Agreement as evidence to interpret the Warrant, this argument also fails.  The language of the Warrant is clear and unambiguous.  "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).  The court "will give effect to the plain-meaning of the contract's terms and provisions." *Osborn*, 991 A.2d at 1159–60; *see In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016).

acknowledged, he could have asked Cannon if she made any changes to the Draft Warrant, and he could have run his own redline.[160] He did neither.

In sum, the court concludes that the Warrant is a valid and enforceable warrant for one percent of Romeo Systems's common stock at the time of exercise.

### D. A Security Interest Did Not Attach to the Warrant Under Article Nine of the Uniform Commercial Code.

The court next turns to whether a valid security interest attached to the Warrant under Article Nine of the Uniform Commercial Code ("UCC") as adopted in Delaware. To determine if a valid security interest attached to the Warrant, this court must determine whether the Pledge Agreement reasonably identified the Warrant as collateral. Cannon argues the Pledge Agreement did not reasonably identify the Warrant as collateral because the Pledge Agreement referred to a warrant for 1,000,000 shares of Romeo Systems common stock, when in fact, the Warrant was for 1% of the Company's outstanding common stock at the time of exercise.[161] Patterson argues the Pledge Agreement reasonably identified the Warrant as collateral in conformity with the UCC.[162] In the alternative, Patterson argues Cannon is equitably estopped to argue that a security interest did not attach to the Warrant.[163]

---

[160] Tr. 203:24–204:1 (Patterson) ("Q. Could you have run a redline?  A.  I could have.").

[161] Pl.'s Opening Br. 35–42.

[162] Def.'s Answering Br. 39–45

[163] *Id.* at 36–39.

47

### 1.    Article Nine of the UCC

Article Nine of the UCC "generally governs the creation, perfection and enforcement of security interests in property." *Pan Ocean Navigation, Inc. v. Rainbow Navigation, Inc.*, 1987 WL 13519, at \*6 (Del. Ch. July 8, 1987), *aff'd on other grounds*, 535 A.2d 1357 (Del. 1987); *accord Haft v. Haft*, 671 A.2d 413, 417 (Del. Ch. 1995). Article Nine of the UCC broadly applies to "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract[.]" 6 *Del. C.* § 9-109(a)(1). "By enacting Article [Nine] of the [UCC], the Delaware legislature opted to replace the pre-code piece-meal multi-statute treatment of secured transactions with a single comprehensive integrated statute which recognizes that all security devices have in common the purpose of giving to certain creditors definite rights in particular property of the debtor." *In re Copeland*, 391 F. Supp. 134, 150 (D. Del. 1975) (citation modified), *aff'd in part, vacated in part sub nom., Appeal of Copeland*, 531 F.2d 1195 (3d Cir. 1976).[164]

---

[164] The UCC was adopted in Delaware on June 2, 1966, and became effective the following year. *Worthy Bros.*, 656 A.2d at 1090–91. "The UCC was drafted for enactment in Delaware by the Committee to Study and Report on the Uniform Commercial Code for Delaware." *Id.* "The Delaware Study Comments to the UCC were prepared by the same Study Committee and were supplemental to the Official Comments to the UCC prepared by the National Conference of Commissioners on Uniform State Laws . . . the drafters of the UCC." *Id.* at 1091. Delaware's enactment of the UCC is intended to be "liberally construed and applied to promote its underlying purposes and policies," including "[t]o make uniform the law among the various jurisdictions." 6 *Del. C.* § 1-103(a). "While

Section 9-203 outlines the necessary steps to create an enforceable security interest. The "[a]ttachment [of a security interest] gives the creditor a lien on an asset of the debtor, and occurs when the debtor grants the lien, usually in a security agreement." *Oak Rock*, 527 B.R. at 114. "The security agreement describes the specific assets pledged by the debtor, and gives the creditor the right to collect the asset and liquidate it to satisfy the debtor's obligation upon default." *Id.* [165]

"A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones

---

Delaware has not adopted the Official Comments prepared by the drafters of the [UCC], these comments are nevertheless useful in interpreting the Code, as it is to be applied in Delaware, in view of the Code's expressed purpose of making uniform the law among the various jurisdictions." *PNC Bank v. Marty's Mobile Homes, Inc.*, 2001 WL 849866, at *1 n.4 (Del. Ch. July 10, 2001) (citation modified). The court may also consider case law from other jurisdictions that addresses comparable UCC provisions. *See Wilm. Tr. Co. v. Mullins*, 1990 WL 990092, at *1 (Del. Com. Pl. Sept. 6, 1990) ("Since uniformity of interpretation is desirable under the [UCC], I conclude that Delaware should follow the line of authority in the cases [from other jurisdictions] cited above."); *see also In re Oak Rock Fin., LLC*, 527 B.R. 105, 113 (Bankr. E.D.N.Y. 2015) ("[W]hile Delaware law governs, the Court may look to decisions from any state or federal courts considering comparable UCC provisions.") (citing *In re Motors Liquid. Co.*, 486 B.R. 596, 616 (Bankr. S.D.N.Y. 2013), *rev'd on other grounds*, 777 F.3d 100 (2d Cir. 2015)).

[165] The "perfection" of a security interest is a distinct UCC concept from the "attachment" of a security interest. Attachment determines the secured party's rights in the collateral as against the debtor, while perfection determines the secured party's rights in the collateral as against third parties, including other secured creditors of the debtor. *See Oak Rock*, 527 B.R. at 114; *Color Leasing 3, L.P. v. F.D.I.C.*, 975 F. Supp. 177, 184 (D.R.I. 1997) ("Perfection is the method by which a secured creditor seeks to establish priority over other secured creditors."). Attachment is a precondition to perfection. 6 *Del. C.* § 9-308(a) ("[A] security interest is perfected if it has attached and all of the applicable requirements for perfection [under the UCC] have been satisfied.").

the time of attachment." 6 *Del. C.* § 9-203(a); *see 6 Del. C.* § 9-203, cmt. 2

("Subsection (a) states the general rule that a security interest attaches to collateral

only when it becomes enforceable against the debtor").[166] A security interest is

enforceable against the debtor and third parties with respect to the collateral only if:

(1) "value has been given"; (2) "the debtor has rights in the collateral or the power

to transfer rights in the collateral to a secured party"; and (3) "the debtor has signed

a security agreement that provides a description of the collateral[.]" 6 *Del. C.* § 9-

203(b).[167] Only the third requirement, that the security agreement provides a

description of the collateral, is at issue here.

Section 9-108 provides the standard to determine the sufficiency of the

description of collateral in a security agreement.[168] A description of collateral in a

security agreement is "sufficient," "whether or not it is specific, if it reasonably

identifies what is described." 6 *Del. C.* § 9-108(a). "A description of collateral

---

[166] In 1999, the National Conference of Commissioners on Uniform State Laws made "comprehensive" revisions to Article Nine of the UCC. James J. White, Robert S. Summers & Robert A. Hillman, *Uniform Commercial Code* § 30:1, at 3 (6th ed. 2015) hereinafter "White, *Uniform Commercial Code*". "Most of the old sections [were] renumbered, and some sections [were] dismembered, with their parts spread among new sections." *Id.* These revisions become effective in July 2001 and have been enacted in all 50 states. *Id.* Section 9-203(a) previously appeared in the UCC as Section 9-203(1).

[167] None of the other conditions listed in Section 9-203(b)(3) are pertinent to this case. *See* 6 *Del. C.* § 9-203(b)(3)(B)–(E).

[168] Section 9-108 previously appeared in the UCC as Section 9-110. *See* Cynthia Grant, *Description of the Collateral Under Revised Article 9*, 4 DePaul Bus. & Com. L.J. 235, 236 (2006) ("Revised 9-108 replaced former 9-110.").

reasonably identifies the collateral if it identifies the collateral by: (1) specific listing; . . . (4) quantity; . . . or (6) . . . any other method, if the identity of the collateral is objectively determinable." 6 *Del. C.* § 9-108(b)(1)–(6). A description is reasonable if it "enable[s] third persons to identify the property." *Bank of Middleton v. Town & Country Ford Tractor, Inc.*, 1979 WL 30047, at *589 (Wis. Cir. Ct. July 25, 1979). As the Comment to Section 9-108(b) explains:

> The purpose of requiring a description of collateral in a security agreement under Section 9-203 is evidentiary. The test of sufficiency of a description under this section, as under former Section 9-110, is that the description do the job assigned to it: make possible the identification of the collateral described. This section rejects any requirement that a description is insufficient unless it is exact and detailed (the so-called 'serial number' test).

6 *Del. C.* § 9-108(b), cmt. 2.

In other words, the description must objectively identify the collateral so that, at a minimum, it "puts subsequent creditors on notice so that, aided by inquiry, they may reasonably identify the collateral involved," *Bishop v. All. Banking Co.*, 412 S.W.3d 217, 220 (Ct. App. KY, 2013) (citation modified) (quoting *Nolin Prod. Credit Ass'n v. Canmer Deposit Bank*, 726 S.W.2d 693, 697 (Ky. Ct. App. 2013). In that regard, the description of collateral in the security agreement or accompanying documents must "raise a red flag" to a third party indicating that more investigation may be necessary to determine whether an item is subject to a security agreement. *In re Pickle Logging, Inc.*, 286 B.R. 181, 184 (Bankr. M.D. Ga. 2002).

51

"[A] security interest in collateral is not enforceable *against the debtor or third parties* unless the debtor has signed, executed, or otherwise adopted a security agreement that contains a description of the collateral." *Id*. (emphasis added).

### a. The court uses an objective third-party standard to evaluate the sufficiency of the collateral's description in a **security agreement.**

The parties disagree over whether the court must evaluate the sufficiency of the description of the collateral in the security agreement from the perspective of a hypothetical third-party (*i.e.*, a different creditor of the debtor) or from the perspective of the specific parties to the security agreement. Cannon argues the sufficiency of the description "is evaluated from a third-party perspective based on the face of the security agreement" and "the debtor's intention to create a security interest in particular collateral is irrelevant," regardless of whether the dispute before the court is between the original debtor and original lender or between the original lender and a third-party.[169]

Patterson argues the Section 9-108 analysis "generally considers an objective third-party perspective," but "in original-party disputes, the debtor's perspective is also relevant."[170] Cannon, in her supplemental reply brief, acknowledges there are

---

[169] Dkt. 248 ("Pl.'s Suppl. Opening Br.") at 1; Dkt. 251 ("Pl.'s Suppl. Reply Br.") at 8–9 (arguing there is no separate standard applicable to disputes between the parties to a security agreement).

[170] Dkt. 250 ("Def.'s Suppl. Answering Br.) at 3.

cases holding that "the perspectives and intent of the secured party and debtor are relevant in an 'original-party dispute,'" but she argues that these cases are "impossible to square with" the official commentary to Section 9-203(1), the predecessor to the current Section 9-203(a).[171]

The cases which Patterson cites for the proposition that this court may consider the intent of the parties from sources outside the writing are not persuasive. The relevant language in most of those cases is dicta, and some of it has been narrowed in subsequent opinions.

---

[171] That commentary provides, in pertinent part: "[A] security interest, absent a writing which satisfies paragraph (1) (a), is not enforceable even against the debtor, and cannot be made so on any theory of equitable mortgage or the like. . . . More harm than good would result from allowing creditors to establish a secured status by parol evidence after they have neglected the simple formality of obtaining a signed writing." David Frisch, *Lawrence's Anderson on the Uniform Commercial Code* § 9-203:1 Official Code Comment, 8A Part II Anderson U.C.C. § 9-203:1 cmt. 5 (3d. ed. Dec. 2024 Update).

Official UCC commentary should instruct this court when applying Section 9-108. The UCC generally mandates that courts interpret its provisions to promote its "underlying purposes and policies" including "simplification and clarification of the law and continued expansion of commercial practices." *In re Middle Atl. Stud Welding Co.*, 503 F.2d 1133, 1135 (3d Cir. 1974); *see* 6 *Del. C.* § 1-103(a) ("The [UCC] must be liberally construed and applied to promote its underlying purposes and policies . . . ."). The official UCC commentary is a useful tool for courts when interpreting the statute, but, of course, it is not the only tool available. To promote the UCC's expressed purpose of creating uniform law of secured transactions, courts *may* consider case law from other jurisdictions applying and interpreting similar UCC provisions. *See Mullins*, 1990 WL 990092, at *1; *Oak Rock*, 527 B.R. at 113–14. Both the UCC commentary and case law from other jurisdictions are persuasive authority for courts to consider when tasked with applying and interpreting the provisions of the UCC. But, to the extent that a decision from another jurisdiction is aberrant or clearly contradicts the text of the official UCC Commentary or the Delaware Study Comments to the UCC, this court is not required to follow or extend such authority. *See id.*

In *In re O & G Leasing, LLC*, 456 B.R. 652 (Bankr. S.D. Miss. 2011), the court observed: "'[I]f the parties to the agreement understand what collateral was pledged, the security interest cannot be challenged on the basis that the agreement insufficiently describes the collateral.'" *Id*. at 663 (quoting 79 C.J.S. Secured Transactions § 45 (June 2011)). But the court did not treat the case as between the lender and debtor, but rather as involving a third party. The court concluded that the description of the collateral was sufficient for the attachment of a security interest because it was "sufficient to raise a red flag to third parties that more investigation may be necessary." *Id*. at 664.

The quotation in C.J.S upon which the *O & G* court relied cites one case, *In re Michelle's Hallmark Cards & Gifts, Inc.*, 219 B.R. 316 (Bankr. M.D. Fla. 1998). In *Michelle's Hallmark*, the bankruptcy court found a description of the collateral to be all the "furniture, fixtures, equipment, and inventory of the [b]orrowers' proprietorship" sufficient under Florida law. *Id.* at 320. The court went on to say, in *dicta*, that "if the parties to the agreement understand what collateral was pledged, the security interest created by the agreement cannot be challenged on the basis of an insufficient description of the collateral." *Id*. *Michelle's Hallmark*, in turn relied solely on *In re Florida Bay Trading Co.* (*Florida v. Feldman*), 177 B.R. 374 (Bankr. M.D. Fl. 1994), which stated: "While it is clear that the security agreement *must furnish an adequate description of the collateral pledged*, if it is clearly understood

54

by the parties what was pledged as security and the extent of the security interest created such security agreement cannot be challenged by *third parties* on the basis that the description of the collateral lacks specificity." 177 B.R. at 381 (emphasis added). *Florida Bay* cited no case law or provision of the UCC to support this statement, which is not binding on this court and appears contrary to the UCC itself. If a third party cannot challenge an inadequate description of collateral when the parties to the security agreement understand it to mean something other than what it says, then Sections 9-108 and 9-203 would be rendered meaningless. Another court from the Gainesville Division of the same court seems to recognize as much. In *In re Hintze*, 525 B.R. 780 (Bankr. N.D. Fl. 2015), the court pointed to the conditional language in *Florida Bay Trading* (i.e., "[w]hile it is clear that the security agreement must furnish an adequate description of the collateral pledged") as an acknowledgment that an adequate description of collateral in the security agreement was a prerequisite to establishing a security interest in collateral. *Id.* at 790. This court agrees—"[o]ne must read the cited language [from *Michelle's Hallmark,* which cites *Florida Bay Trading*] in a vacuum and out of context in order to agree with [Patterson's] interpretation. *See id.* [172]

---

[172] Patterson treats the parties' clear understanding as a fait accompli. This court is not as sure; however, because this court will not review parol evidence to determine if a security

In *In re Wharton*, 563 B.R. 289 (9th Cir. Bankr. App. Panel, 2017), the court, concluded that a description in a 2011 security agreement between the original parties which described a 1965 Corvette as "the Corvette" (not "a Corvette") was sufficient because (i) the debtor and creditor knew what collateral was at issue from the description and (ii) the description met the "lenient description standard" under Nevada law. *Id*. at 298–99. The Ninth Circuit, therefore, like the Florida Bankruptcy Court in *Hintze*, required the description of collateral to be sufficient under Nevada law.

Lastly, Patterson relies on *River Oaks Chrysler-Plymouth, Inc. v. Barfield*, 482 S.W.2d 925 (Tex. Civ. App. 1972). In *River Oaks*, the court found that the description of the car, including the brand, year, model, speedometer reading, and the license plate number, reasonably identified the collateral under Texas law. *Id.* at 928. The court added that this was "particularly so in light of the fact that the current dispute is between the creditor and debtor, not between the creditor and a third party," because "[t]he debtor is fully aware of what collateral is concerned and does not need any information in addition to that found in the work order in order to identify the car." *Id*.

---

interest attached to the Warrant, the court does not reach the issue of whether or not both Patteson and Cannon understood, at the time the Pledge Agreement was executed by the two parties, what was being pledged by Cannon.

In 2019, the same court refused to extend the selective reading of *River Oaks*, which Patterson now asks this court to extend. In *Cheniere Energy, Inc. v. Parallax Enterprises, LLC*, 585 S.W.3d 70 (Tex. Civ. App. 2019), the Texas Appeals Court, sitting *en banc*, heard an interlocutory appeal from a temporary injunction preventing the appellants, Cheniere Energy, Inc. and Cheniere LNG Terminals, LLC (collectively, the "Cheniere Parties") from non-judicially foreclosing on the equity interest of the appellees, Parallax Enterprises LLC ("Parallax") and various related entities (collectively, the "Parallax Parties"). *Id.* at 74. The trial court granted the requested injunctive relief, and the appeals court, sitting *en banc*, affirmed the trial court's ruling. *Id.* The Cheniere Parties and the Parallax Parties entered into a joint venture to develop liquefied natural gas facilities. To fund the project, Parallax signed a secured promissory note, which Parallax Parties claimed was a capital contribution and the Cheniere Parties claimed was a short-term loan secured by Parallax's equity interest in its wholly owned subsidiary. *Id.* at 74–75. The note provided, in part, the following description: "All of [Parallax's] right, title and interest in the following . . . 8. All other tangible and intangible property and assets of [Parallax.]" *Id.* at 78. The appeals court sitting *en banc* found that this description was super generic and, therefore, did not satisfy the requirements to create a security interest under Texas law. *Id.* at 79. The Cheniere Parties "urge[d] [the appeals court] to consider that the only property Parallax has ever owned is its interest in [its wholly

57

owned subsidiary], and thus, Parallax knew that its equity interest in [its wholly owned subsidiary] was included in the collateral." *Id.* at 80. To support this proposition, the Cheniere Parties relied on the same language in *River Oaks* on which Patterson relies. *See id.* As was the case in *Cheniere Energy*, "[Patterson's] reliance on this language is misplaced . . . [because] the description of the vehicle in *River Oaks* . . . would be sufficient even under the . . . UCC." *Id.* at 80. In addition, "the language on which [Patterson] rel[ies] does not suggest that the debtor's awareness of the creditor's *intent* to create a security interest in particular property is a substitute for a description reasonably identifying the property." *Id.* In fact, the Texas Appeals Court in *River Oaks* "stated that the debtor needed no information 'in addition to' the statutorily sufficient description in the repair order." *Id.* at 80–81 (quoting *River Oaks*, 482 S.W.2d at 928).

This court has considered these cases in light of other cases (which do not consider the parties' intent when determining the sufficiency of the description of collateral), the statutory language, the official UCC commentary, and the Delaware Study Comments. *See*, *e.g.*, *Berkshire Bank v. Kelly*, 217 Vt. 439 (Vt. 2023) (considering a dispute between original contracting parties and finding the description of the security interest was not sufficient between the original contracting parties notwithstanding the parties' intent because the agreement was not, itself, ambiguous); *In re Bradel*, 1990 WL 86714 (Bankr. N.D. Ill. June 19,

1990) (considering a dispute between original contracting parties and finding the descriptions of certain collateral were sufficient whereas other descriptions were not sufficient using a third-party perspective); *see also*, *e.g.*, *Bank of Middleton*, 1979 WL 30047, at \*589 (finding the description of the collateral, a tractor, insufficient, notwithstanding that both debtor and original creditor knew which tractor the description intended to capture); *Landen v. Prod. Credit Ass'n of Midlands*, 737 P.2d 1325, 1329 (Wyo. 1987) ("The security agreement is the contract between the parties; it specifies what the security interest is. Because of its different function [than a financing statement which places third parties on notice], greater particularity in the description of collateral is required in the security agreement than in the financing statement.") (quoting *Am. Rest. Supply Co. v. Wilson*, 371 So.2d 489, 490 (Fla. Dist. Ct. App. 1979)); *Middle At. Stud Welding*, 503 F.2d at 1135 (finding that, while the lower courts found that both the original debtor and original lender "intended the agreement to establish a security interest," the description failed to reasonably identify the after-acquired accounts) 6 *Del. C.* § 9-108(b) ("A description of collateral reasonably identifies the collateral if it identifies the collateral by: . . any other method, if the identity of the collateral is *objectively* determinable."); *id.* at cmt. 2 (providing that "[t]he purpose of requiring a description of collateral in a security agreement under Section 9-203 is evidentiary. The test of sufficiency of a description under [Section 9-108] . . . is that the description do the job assigned to

it: make possible the identification of the collateral described." But, notably, not providing a special test to determine sufficiency of the description of the collateral as between the original debtor and original lender); 6 *Del. C.* § 9-203 (A security interest is enforceable against the debtor and third parties with respect to the collateral when, in pertinent part, "the debtor has signed a security agreement that provides a description of the collateral); *id.* at Delaware Study Comments, cmt. 1– 2 (providing "the description of the collateral is sufficient even though it is general if it reasonably identifies the collateral," but notably not providing a special test to determine sufficiency of the description of the collateral as between the original debtor and original lender).

The court declines to follow the statements from *Michelle's Hallmark*, *Bank of Middleton*, *Wharton*, and *River Oaks* upon which Patterson relies to create a different standard in reviewing the description of collateral when a dispute involves the original debtor and creditor. At best, it seems to represent a minority view, which has been cabined by later decisions.

### 2. The Pledge Agreement did not reasonably identify the collateral.

The Pledge Agreement provides as follows:

1. Pledge. The Pledgor hereby pledges to the Secured Party, and grants to the Secured Party a first priority security interest in all of the following property and interests in property of the Pledgor (the "Pledged Assets"): (a) a warrant to purchase Common Stock in

[Romeo Systems] for one million shares (the "Pledged Securities"); and (b) all proceeds of any of the foregoing. . . .

2. Security for Obligations. The Pledged Assets secures the obligations of the Pledgor arising under, and evidenced by, a Promissory Note of even date to repay all amounts advanced by Secured Party to Pledgor's attorney by March 1, 2018 (the "Obligations").[173]

Cannon argues that the Pledge Agreement's description is insufficient to satisfy the requirements of Article Nine of the UCC because it misdescribes the collateral as a fixed-share warrant for one million shares rather than a fixed-percentage warrant for one percent of Romeo Systems's outstanding stock at the time of exercise.[174] Patterson counters that the Pledge Agreement reasonably identified the Warrant as collateral in conformity with the UCC.[175] Patterson emphasizes that Romeo Systems only issued Cannon one warrant to purchase Romeo Shares, and the Pledge Agreement consistently describes the collateral as *a singular* warrant to purchase common stock of Romeo Systems.[176]

> a. **A description of a fixed-share warrant does not sufficiently describe a fixed-percentage warrant.**

The Warrant was a fixed percentage warrant (specifically, a warrant for one percent of Romeo System's common stock at the time of exercise). The description

---

[173] JX 80 at 3.

[174] *See* Pl.'s Opening Br. 35.

[175] Def.'s Answering Br. 39.

[176] *Id.*

61

of the Warrant as a warrant to purchase "Common Stock in the Issuer [Romeo Systems] for one million shares," (*i.e.*, a fixed share warrant) was not a reasonable description sufficient to create a security interest in the Warrant, which had not been exercised at the time of the Pledge Agreement. Warrants for a fixed number of shares versus a fixed percentage are, at base, different types of warrants.[177]

Section 9-108 does not "require the most exact and detailed description possible," but requires "a description that enables identification of the intended collateral." *Middle Atl. Stud Welding*, 503 F.2d at 1135; *see* 6 *Del. C.* § 9-108 cmt. 2.

As this court has observed, "[n]o magic words are needed to create a security interest." *Haft*, 671 A.2d at 417 (citing *United Va. Bank/Seaboard Nat'l v. B.F. Saul Real Est. Inv. Tr.,* 641 F.2d 185, 189 (4th Cir. 1981)). Although a description need

---

[177] *See* Myron Mallia-Dare & Genesa Olivieri, *Sweetening the Deal: Using Warrants to Get the Deal Done*, ABA (Oct. 8, 2021), https://www.americanbar.org/groups/business_law/resources/business-law-today/2021-october/sweetening-the-deal/ ("The number of shares underlying the warrant may be fixed or expressed as a formula. . . . However, when using a formulaic approach or fixed percentage warrants, start-ups and emerging companies must carefully consider the dilutive effects of any mechanisms that allow for an increase in the number of shares a [warrant holder] may acquire. Alternatively, a company may issue warrants to an investor that will allow the investor to purchase a fixed percentage of shares equal to a fixed percentage of the outstanding equity securities at the time of exercise."); *See also* JX 184 at ¶¶ 15–21 (Using the Black-Scholes-Merton method to value fixed-share warrants and using a Monte Carlo simulation to value fixed-percentage warrants); *see also* JX 185 at 19–20 (Agreeing that the Black-Scholes-Merton method is used to value fixed-share warrants and disagreeing that any method could properly value a fixed-percentage warrant).

not be exact and detailed, if a description is exact and detailed, the description must be accurate, save for minor discrepancies. *See Berkshire Bank*, 296 A.3d at 746–47; *see also* 6 *Del. C.* § 9-203 Delaware Study Comments, cmt. 1 ("The description of the collateral is sufficient even though it is general if it reasonably identifies the collateral. For example, a serial number listing of items of collateral is not required."). "Minor discrepancies in otherwise accurate descriptions will not defeat security interests if the statement would nonetheless enable third persons to identify the property. *Bank of Middleton*, 1979 WL 30047, at *589. The description requirements are "relatively easy to satisfy." *Berkshire Bank*, 296 A.3d at 747; *see also Wharton*, 563 B.R. at 299 (characterizing the description requirements as a "lenient" standard).

The description need not be detailed, but it may not be "seriously misleading." *Bank of Middleton*, 1979 WL 30047, at *589 (holding plaintiff's categorization of an inventory number as a serial number was seriously misleading because "once the plaintiff elected to identify the tractor by serial number rather than other characteristics . . . defendant had a right to rely on the number listed."). A typographical error where the rest of the description sufficiently describes the collateral is not seriously misleading. *See In re Bucala*, 464 B.R. 626, 631 (Bankr. S.D.N.Y. 2012); *see also Laurel Explosives, Inc. v. First Nat'l Bank & Tr. Co. of Corbin*, 801 S.W.2d 336, 338 (Ky. Ct. App. 1990) (holding that an incorrect serial

number, which erroneously included an extra "0" before the last four digits was not seriously misleading if, with inquiry, the appellant would be able to identify the collateral, with such inquiry being a search of the county clerk's records for the financing statement which provided the correct serial number).  Additionally, while the description requirement is a "lenient" standard, "[t]he description of collateral in a security agreement should be written with reasonable clarity so that those with an interest in the matter, potential future lenders and reviewing courts, need not hazard a guess as to just what property was intended to be covered." *Pan Ocean*, 1987 WL 13519, at *7.  "A description can be insufficient either because it is too narrow, and so excludes collateral intended by the parties to be covered, or because it is too broad and so may include property not intended."  White, *Uniform Commercial Code* § 31:5, at 168 (citation modified).

Patterson argues that optional, albeit incorrect details, in a description of a security interest should not make such description insufficient, stating that a finding otherwise would codify in Delaware the already rejected "serial number test."  This misunderstands the standard.  Delaware does not require, in the first instance, a description that is "exact and detailed (the so-called 'serial number' test)."  6 *Del. C.* § 9-108, cmt. 2.  But if a lender chooses to provide a description of collateral that is "exact and detailed," then the description must be reasonably accurate.

Patterson next makes a quantity over quality argument, insisting that the only error in the description was a single detail—the rights provided under the Warrant—which he claims are not sufficient to make the description seriously misleading.[178] Patterson claims that the description provided:

> at least **seven** distinct points of detail concerning the collateral: (1) the type of asset ('a *warrant'*); (2) the quantity ('*a* [singular] warrant'); (3) the type of warrant ('*to purchase* Common *Stock*'); (4) the corresponding class of stock ('*Common* Stock'); (5) the Issuer (Romeo Systems); (6) the number of shares the Warrant's holder could purchase ('one million shares'); and (7) the fact that the collateral included all proceeds from any disposition of the Warrant.[179]

Patterson further argues that Cannon objected only to the number of corresponding shares, and so, the description is sufficient because the "multiple other details provide more than enough 'keys' to the collateral's identity."[180] This argument, however, presumes that the number of shares underlying a warrant bears little significance.[181] The court disagrees. Providing an incorrect number of shares underlying a warrant is not, in this case, a typographical error. There is a vast difference between a fixed share warrant and a fixed percentage warrant measured at the time of exercise. The comparison brings to mind Mark Twain's observation

---

[178] Def.'s Suppl. Answering Br. 12–14.

[179] *Id.* at 14 (emphasis in original).

[180] *Id.*

[181] *See id.* at 12–14 (citing *Bucala*, 464 B.R. at 631 (holding that a typographical error in description of collateral still produced a valid security interest).

that "[t]he difference between the almost right word and the right word is really a large matter—'tis the difference between the lightning bug and the lightning."[182] But in this case, the description of the Warrant as being for 1,000,000 shares is not even close.

Third, Patterson argues that, under 6 *Del. C.* § 9-108(b)(6), the description of the warrant in the Pledge Agreement was reasonable because the description would place a third party on notice that the collateral attached to the Warrant by "raise[ing] a red flag to [the] third party so as to indicate that more investigation may be necessary to determine whether an item is subject to a security interest."[183] But Patterson cannot point to any specific language in the Pledge Agreement that would raise a red flag to anyone looking at the description of the collateral.

This case is nothing like *In re Brown*, 479 B.R. 112 (Bankr. D. Kan. 2012), where the security agreement described the collateral as seven shares of preferred stock in an LLC. *Id.* at 119. The court noted that the "description [was] 'specific' but inaccurate because it refer[red] to 7 shares of preferred stock in a LLC—LLCs don't issue stock." *Id.* Although the description was inadequate, it provided "clues sufficient that third persons by reasonable care and diligence may ascertain the

---

[182] Mark Twain, *The Art of Authorship: Literary Reminiscences, Methods of Work, and Advice to Young Beginners* 87–88 (George Bainton Ed., New York, D. Appleton & Co. 1891).

[183] Def.'s Suppl. Answering Br. 6 (citation modified).

property covered." *Id.* The court, after considering the descriptions deficiencies, found that, "by an admittedly thin margin, the Bank's description reasonably identifie[d]" the collateral and a security interest attached, because "LLCs typically do not issue 'stock,' [therefore,] a reader could reasonably conclude that the 'preferred stock' was, in fact, a membership interest." *Id.*; *see also Middle Atl. Stud Welding*, 503 F.2d at 1136 (holding that the description "all accounts receivable" did not include after-acquired accounts because, while most "prospective lenders . . . would obtain an unambiguous explanation of its full meaning from the secured party, some might be misled and proceed without inquiry … [t]he ease with which a secured party could eliminate the danger of misleading any reasonable subsequent lender suggests that in administering the [UCC] the courts should require him to do so.").[184]

Unlike in *Brown*, where the inaccurate description of the collateral as stock, rather than LLC membership interests, companies can and do issue warrants for both fixed numbers of shares and fixed percentages of shares.[185] Nothing on the face of

---

[184] Patterson also relies on *Middle Atlantic Stud Welding*, but, unlike the facts in *Middle Atlantic Stud Welding*, in which the court determined it was ambiguous whether or not after-acquired accounts were included in the description of "all accounts receivables," such ambiguity is not present in the description of the Warrant in the Pledge Agreement. *See* 503 F.2d at 1135–1137. This court also considered that no other document, such as a publicly filed financing statement, existed regarding the Warrant so as to alert third parties of a potential security interest on the Warrant.

[185] *See* JX 184 at 7–8, Ex. 1–3.

the description, "a warrant to purchase Common Stock in the Issuer for one million shares" indicates that additional inquiry is required to determine if, in fact, the as described warrant exists or if the Warrant is instead a warrant for one million shares.[186]

The court finds that the description of the Warrant did not reasonably describe the collateral, and, thus, no security interest attached to the collateral, and the security interest is not enforceable against Cannon.[187] The description of the Warrant would not correctly describe the collateral even if the collateral was intended to be the Draft Warrant prior to the stock split, or the Draft Warrant after the 10-for-one stock split. Specifically, the Draft Warrant described a one percent

---

[186] *See* JX 80 at 3. Patterson relies on non-Delaware cases that have applied a two-part test to determine whether a description is reasonable: "(1) if the collateral is such that the debtor may own other, similar items, the descriptions must enable a third party to distinguish the collateral from the other property, regardless of whether the debtor *actually* owns more than one such item of property; but (2) if the collateral is such that the debtor is not likely to own more than one item as described, a more general description is sufficient." *Bradel*, 1990 WL 86714, at *6. *See also In re Carlos*, 215 B.R. 52, 60 (Bankr. C.D. Cal. 1997); *Aronson Furniture Co. v. Johnson*, 47 Ill.App.3d 648, 653 (Ill. App. Ct. 1997). These cases involved retail installment contracts. In any event, even if the standard were applicable, the court concludes that a warrant to purchase Romeo Systems stock is something that Cannon might own more than one of, even though the record reflects that she actually did not own more than one. And even if she was not likely to own more than one warrant to purchase Romeo Systems stock, the description in the Pledge Agreement still did not sufficiently describe the Warrant.

[187] Patterson raised two additional new arguments in his post-trial supplemental briefing; because these arguments fell outside the requested supplemental briefing, these new arguments are considered waived by Patterson. *See* Def.'s Suppl. Answering Br. 4–5 (arguing that the description of the collateral meets both the "specific listing" and "quantity" prongs of Section 9-108).

68

at issuance warrant, not a fixed share warrant, and the shares underlying the Draft Warrant at the time of issuance were actually 90,000 shares, not one million shares.[188] After the stock split, the description in the Pledge Agreement did not accurately describe the post-stock split Draft Warrant, because, post-stock split, the number of shares underlying the Draft Warrant was 900,000, not one million.[189] The description of collateral does not sufficiently describe either the Draft Warrant or the Warrant.

Patterson relies on *dicta* from *Pan Ocean*, a books and records action under Section 220 of the DGCL, for the proposition that this court should consider parol evidence to interpret the description of the Warrant. 1987 WL 13519. The decision focused, in part, on whether the party making the demand owned stock in the defendant company. A central question was whether the defendant, Rainbow Navigation, Inc. ("Rainbow"), acquired a valid security interest in its own stock held by the plaintiff Pan Ocean Navigation, Inc. ("Pan Ocean"). Pan Ocean held the stock

---

[188] Tr. 300:2–16 (Patterson) ("Q. Could you please tell me how you get 1 percent to equal 100,000 if the issued shares were 9 million? A. It should have actually been 90,000 that he got, so he got too much. Q. So 100,000 wasn't even right either, was it? A. No. It should have been 90, you're right. Q. So all these years that that [*sic*] hundred thousand was on the cap table – and I think you said auditors looked at it, lawyers looked at it, you looked at it, Ms. Webb looked at it – you mean to tell me it should have said 90,000 all those years? A. That's correct.").

[189] *Id.* at 305:7–16 ("Q. What would 90,000 be on a forward 10-for-1 split? A. less than I gave her. Q. How much would it be, Mr. Patterson? A. 900,000. Q. 900,000? A. Versus a million. Q. And the pledge agreement said how many? A. 1 million.").

on behalf of a retirement trust ("IRAP") managed by Tower Asset Management, Inc., an affiliate of Tower Capital Corporation. *See* 1987 WL 13519, at *2, *5. Rainbow argued that a letter signed by Pan Ocean's then-president purported to pledge the stock owned by IRAP to secure a loan to a wholly owned subsidiary of Pan Ocean. *Id.* at *5, *7. That letter stated as follows: "Tower Capital Corporation hereby pledges its stock interest in Rainbow Navigation, Inc. as security for the payment of the aforementioned promissory note." *Id.* at *7.

The court concluded that the letter did not adequately describe the collateral under Article Nine of the UCC because the trial record indicated that Tower Capital Corporation did not itself own any stock in Rainbow. The court reasoned that "[t]he description of collateral in a security agreement should be written with reasonable clarity so that those with an interest in the matter, potential future lenders and reviewing courts, need not hazard a guess as to just what property was intended to be covered" and "[t]his level of clarity is absent in the October 30 [letter] writing." *Id.* The evidence showed that Tower Capital Corporation did not itself own any stock in Rainbow, and "in these circumstances, one cannot with any confidence know from the description of the collateral contained in the claimed security agreement what is the body of collateral in which an interest is purportedly created." *Id.* Chancellor Allen continued: "*Even if parol testimony were to be considered*, I could not conclude that the parties each intended the language used to embrace all

70

of the stock owned indirectly by the IRAP. . . . The description of the covered collateral is fatally obscure." *Id.* (emphasis added). As a result, the court concluded that Rainbow did not acquire a valid security interest under Article Nine of the UCC. *Id.* at \*8.

Patterson reads "[e]ven if <u>parol</u> testimony were to be considered" to stand for the proposition that parol evidence was, indeed, considered. But, *Pan Ocean* states only that "*if* parol evidence" were to be considered, such consideration would not change the court decision that the collateral in question was not sufficiently described in the security agreement to cause a security interest to attach to such collateral. Nowhere did the court state that extrinsic evidence could be considered to save an objectively insufficient description of collateral. For this reason, the court declines to extend the dicta in *Pan Ocean* to consider parol evidence when assessing the description of a clean and unambiguous security agreement.

Because no security interest attached to the Warrant, this court need not consider whether Patterson's transfer of the Warrant in 2018 complied with the requirements of Article Nine. Additionally, the court does not consider Patterson's argument that, presuming that the security interest has attached, Patterson is

71

protected from liability by the exculpation clause in the Pledge Agreement.[190]

Patterson did not assert protection by the exculpation clause in the Pledge Agreement

in the event that this court determined no security interest attached to the Warrant;

therefore, this court treats this argument as waived.[191] *See e.g., Wal-Mart Stores,*

*Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1281 (Del. 2014)

(affirming the Court of Chancery's holding that IBEW waived an argument which

was not raised in its opening post-trial brief); *see also, Emerald P'rs v. Berlin*, 2003

WL 21003437, at *43 (Del. Ch. Apr. 28, 2003), *aff'd*, 840 A.2d 641 (Del. 2003) ("It

is settled Delaware law that a party waives an argument by not including it in its

brief.").

## E.    Estoppel

Patterson argues that the doctrine of equitable estoppel bars Cannon from

disputing that the Pledge Agreement formed a valid security interest in the Warrant.

Cannon argues that the doctrine of equitable estoppel, an equitable defense, is

---

[190] The Pledge Agreement's exculpation clause provides as follows:

> 17. <u>Duty of Care</u>.  [Patterson] shall not be liable for any acts, omissions, errors of judgment or mistakes of fact or law, *including, without limitation, acts, omissions, errors or mistakes with respect to the Pledged Assets, except for those arising out of or in connection with such person's gross negligence or willful misconduct.*  Without limiting the generality of the foregoing, the Secured Party shall not be under any obligation to take any steps necessary to preserve rights in the Pledged Assets against any other parties.

JX 80 at 6

[191] *See* Def.'s Answering Br. 59–60.

inapplicable to the formation of a security interest and attachment of collateral under Article Nine of the UCC. This court is not persuaded to apply equity to establish a valid security interest in the Warrant when a valid security interest does not attach at law.

Equitable estoppel is an affirmative defense for which Patterson bears the burden of proof. *See* Ct. Ch. R. 8(c)(1) (listing estoppel as an affirmative defense); *Pilot Point Owners Ass'n v. Bonk*, 2008 WL 401127, at *2 (Del. Ch. Feb. 13, 2008) (observing that "the party asserting the defense of equitable estoppel . . . bears the burden" of establishing the defense). The standard of proof necessary to establish equitable estoppel is clear and convincing evidence. *Id.*; *see e.g., Empls.' Liab. Assurance Corp. v. Madric*, 183 A.2d 182, 188 (Del. 1962); *see also e.g., Vintage Rodeo Parent, Ltd. Liab. Co. v. Rent-A-Center, Inc.*, 2019 WL 1223026, at *23 (Del. Ch. Mar. 14, 2019) ("As the party asserting equitable estoppel, the Plaintiffs bear the burden of proof, which is clear and convincing evidence."). Typically, "[t]he doctrine of equitable estoppel is invoked 'when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment.'" *Nevins*,885 A.2d at 249 (quoting *Wilson*, 209 A.2d at 903–04).

In Delaware, the principles of law and equity, including estoppel, may supplement the provisions of the UCC but may not supplant them. *See* 6 *Del. C.* § 1-103 ("Unless displaced by the particular provisions of the Uniform Commercial

Code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause supplement its provisions."); 6 *Del. C.* § 1-103 cmt. 2 ("[W]hile principles of common law and equity may *supplement* provisions of the [UCC], they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the [UCC] provides otherwise. In the absence of such a provision, the [UCC] preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies.") (citation modified); *Cont'l Fin. Co., LLC v. TD Bank, N.A.*, 2018 WL 565305, at *2 (Del. Super. Ct. Jan. 24, 2018), ("The policy underlying [the rule that common law supplements, not supplants the UCC] is the recognition that the UCC promotes certainty in commercial disputes by allocating responsibility among the parties according to whoever is best able to prevent a loss.") (citation modified). "The [UCC] grew out of the desirability of a more uniform act governing the law of commercial transactions and the recognition that current laws were inadequate to cope with modern business practices." *Cline v. Prowler Indus. of Md., Inc.*, 418 A.2d 968, 973 (Del. 1980).

The Delaware Supreme Court's reasoning in *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase Bank, N.A.*, 103 A.3d 1010

(Del. 2014), is instructive. In that case, the Court declined to recognize an equitable exception to save an incorrectly canceled UCC−3 termination statement. *Id.* at 1014−18. The Court noted,

> [t]o hold that parties cannot rely upon authorized filings unless the secured party subjectively understood the effect of its own action would disrupt and undermine the secured lending markets. It is not clear to us how an inquiring party would find out whether a secured party understood and intended the consequences of its own filing. In the normal course of business, which is what the Delaware UCC embraces as appropriate policy, a party who causes a document to be executed and filed on its behalf is expected to understand what the filing says, the effect the filing will have, and that its own act of causing the document to be executed and filed will signal to others that the filing party subjectively intends for the filing to have the effect resulting from plain terms. If we were to embrace JPMorgan's theory, no creditor could ever be sure that a UCC−3 filing is truly effective, even where the secured party itself authorized the filing, unless a court determined after costly litigation that the filing was in fact subjectively intended.

*Id.* at 1017.

The concern that third parties would not have clarity of contract with regard to security interests held by other parties rings true in both an interpretation of a security agreement or a publicly filed UCC-3 filing. If equitable estoppel can prevent Cannon from disputing the Pledge Agreement formed a valid security interest in the Warrant, this would disrupt a third party creditor's ability to have clarity on security interests held in collateral based on the face of the security agreement, "unless a court determined after costly litigation that [the security interest] was in fact subjectively intended." *See id.*

75

Cannon provides the following analysis:

> [I]f a security agreement that did *not* reasonably identify collateral on its face could nonetheless be construed to create a security interest in that collateral based on extrinsic facts and circumstances not apparent from the face of the document, then potential secured lenders deciding whether to lend against particular collateral and conducting diligence on the putative debtor's existing security agreements could not rely solely on those agreements to determine whether the putative collateral is already encumbered by a security interest in favor of another.[192]

Patterson may not invoke equitable estoppel to supplant the UCC. He has not identified a specific provision of the UCC that states principles of common law and equity may supplant Section 9-108 or a decision from any jurisdiction holding that a debtor was equitably estopped from challenging the validity of a purported security interest.[193] This court has also failed to find any such case that follows the Delaware standard for allowing common law or equitable defenses.[194]

---

[192] Pl.'s Opening Br. 40.

[193] *See* Def.'s Answering Br. 36–39.

[194] The court did identify caselaw from Montana authorizing the defense of "equitable estoppel as it may pertain to [UCC] claims." *Christman v. Clause*, 443 P.3d 472, 478 (Mont. 2019). But Montana courts apply a different standard than Delaware. *Compare id.* ("[The Montana Supreme Court] recently concluded that 'the doctrine of equitable estoppel may apply to cases governed by the U.C.C. unless displaced by specific U.C.C. provisions.'") (quoting *Kapor v. RJC Inv., Inc.*, 434 P.3d 869, 874 (Mont. 2019)), *with Cont'l Fin*, 2018 WL 6498687, at *2 ("The UCC displaces the common law claims.") (citing 6 *Del. C.* § 1-103(b), cmt. 2 ("In the absence of [a contrary UCC] provision, the [UCC] preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies.")).

For the above reasons, this court finds that the defense of equitable estoppel is inapplicable to the formation of a security agreement and attachment of collateral under Article Nine of the UCC.[195]

## F.    Conversion

Cannon argues that Patterson converted the Warrant when he caused the Company to transfer the Warrant into his name in 2018 without holding a valid security interest, and subsequently, when he exercised the Warrant and obtained stock of Romeo Systems and then Romeo Power, without holding a valid security

---

[195] Even if the doctrine of equitable estoppel and equitable defenses were applicable to the formation of a security agreement, Patterson has not met the requirements to show the necessity of equitable estoppel in this case.

The party claiming estoppel must demonstrate that: "(i) they lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) they reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) they suffered a prejudicial change of position as a result of their reliance." *Nevins*, 885 A.2d at 249. "Regardless of the form of the action, the burden of proof of estoppel rests upon the party asserting it.  Furthermore, equitable estoppel must be proven by clear and convincing evidence . . . ." *Id.*

Patterson fails to establish equitable estoppel under the first prong.  This dispute "turns on the poor job [Patterson and his counsel] did in describing [Cannon's] collateral." *Brown*, 479 B.R. at 117.  Patterson and his counsel drafted the Pledge Agreement and the Promissory Note.  Tr. 226:6–11  There is no dispute that Patterson had access to the Warrant and could have, had he so chosen, provided the Warrant to Orrick to aid the drafting of the documents.  *See* JX 34 (email from Cannon to Patterson on December 25, 2025, with the Warrant as an attachment); JX 35 (email from Patterson to Cannon on December 27, 2025, acknowledging receipt of the Warrant from Cannon); JX 36 (email from Patterson to Cannon transmitting the counter-signed signature page for the Warrant).  Cannon did not negotiate or revise either document.  Tr. 227:3–5 (Patterson).  Patterson, therefore, had the means of obtaining the knowledge that the warrant described in the Pledge Agreement was not the Warrant.

77

interest.[196]  Patterson raises four defenses, three of which rest on the assumption that a security interest attached to the Warrant, with the fourth being that Cannon did not properly demand a return of the Warrant before pursuing this litigation.[197]

Conversion is generally "any distinct act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it." *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933); *accord Sjunde AP-fonden v. Activision Blizzard, Inc.*, 2024 WL 863290, at *10 (Feb. 29, 2024); *CIT Commc'ns Fin. Corp. v. Level 3 Commc'ns, LLC*, 2008 WL 2586694, at *2 (Del. Super. June 6, 2008).  To prove a claim for conversion, Cannon must show:  (1) the plaintiff held a property interest in the allegedly converted property; (b) the plaintiff had a right to possess that property at the time of the alleged conversion; and (c) the defendant converted the plaintiff's property by exercising wrongful dominion over the plaintiff's property in denial of or inconsistent with the plaintiff's rights and without the plaintiff's authority or consent.  *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 536 (Del. 1996), *Malca v. Rappi, Inc.*, 2021 WL 2044268, at *3 (Del. Ch. May 20, 2021).  "Conversion need not be accompanied by 'a subjectively wrongful intent' to be actionable.  A person who mistakenly believes that his or her conduct is legal may

---

[196] Pl.'s Opening Br. 48.

[197] Def.'s Answering Br. 33–35.  Because this court finds that no security interest has attached to the Warrant, this court need not reach arguments based upon the assumption of its validity.

nonetheless commit conversion." *Segovia v. Equities First Hldgs., LLC*, 2008 WL 2251218, at *19 (Del. Super. Ct. May 30, 2008) (citation omitted); *id.* at *20 ("[E]ven though the record is devoid of evidence that would allow a reasonable fact finder to conclude that [the defendant] acted with malice or bad faith when it sold the pledged stock, this does not excuse the fact that the sale deprived [the plaintiff] of her ownership interest in the stock without her consent.").

Because a valid security interest did not attach to the Warrant, the court finds: (1) Cannon held a property interest in the Warrant; (2) Cannon had a right to possess that property, and (3) Patterson exercised dominion wrongfully by exercising the Warrant without Cannon's consent. Patterson argues that Cannon's conversion claim must fail, however, because she did not make a proper demand for the return of the Warrant before filing suit. The inquiry is two-fold: (1) whether Cannon was required to first demand return of the Warrant before filing suit, and (2) if so, whether she did.

Delaware law recognizes that a "demand and a refusal to deliver are usually evidence of a conversion and when the original possession of the defendant is lawful must in most cases be shown at the trial to establish that charge." *Drug*, 168 A. at 94; *see CIT Commc'ns*, 2008 WL 2586694, at *2 ("[I]f a party was once in lawful possession of the plaintiff's property, the plaintiff must first make a demand upon that party for return of the property before bringing an action at law for

79

conversion."); *accord Touch of Italy Salumeria & Pasticceria, LLC v. Bascio,* 2014 WL 108895, at *7 (Del. Ch. Jan. 13, 2014); *Gulf Aviation Servs. Grp. WLL v. Wilm. Tr. Co.*, 2023 WL 9118772, at *12 (Del. Super. Ct. Dec. 29, 2023).

The purpose of the demand requirement, where it applies, "is simply to settle whether there has been a conversion or not." *Mastellone v. Argo Oil Corp.*, 82 A.2d 379, 384 (Del. 1951).[198] The demand rule does not apply "when the alleged wrongful act is of such a nature, as to amount, in itself, to a denial of the rights of the real owner[.]" *Drug*, 168 A. at 94; *see also Malca*, 2021 WL 2044268, at *5; *Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *23 (Del. Ch. March 5, 2024). "In other words, demand is not required when the claim for conversion results from 'an exercise of ownership by disposing of the property by lease, pledge, or sale.'" *Gulf Aviation Servs.*, 2023 WL 9118772, at *12 (quoting 18 Am. Jur. Conversion § 75 (2023)); *see Segovia*, 2008 WL 2251218, at *20.

---

[198] The Court in *Mastellone* offered the following examples of when demand would be appropriate and when it would not:

> In some instances, as for example, when a man lends a chattel to another, it would be wholly unconscionable to permit the bailor to sue and recover judgment and costs of conversion against the bailee until the court could be convinced that there had been an actual effort to withhold the property. Therefore, in such a case, in the absence of a demand and refusal, the court could not give the plaintiff judgment in trover. On the other hand, if a person should consume, sell, destroy, or otherwise dispose of the article loaned, there would be no purpose in demanding its return.

82 A.2d at 384. This case reflects the latter scenario.

*Gulf Aviation Services* is instructive. In that case, our Superior Court considered an agreement between Gulf Aviation Services ("Gulf") and Wilmington Trust Company (WTC) whereby WTC was to hold to hold a helicopter as the owner trustee on behalf of Gulf. 2023 WL 9118772, at *2. When Gulf violated the trustee agreement, WTC sold the helicopter to a third party without providing prior notice to Gulf. *Id.* at *4–5. Gulf then filed suit against WTC for conversion. *Id.* at *6. WTC argued that "Gulf was required—and failed—to demand the helicopter's return before commencing th[e] action." *Id.* at *12. The Superior Court found that, because WTC no longer had control over the helicopter, "demand [for its return by Gulf] would have been futile." *Id.*; *see id.* ("Gulf's failure to make a pre-litigation demand for return of the helicopter does not bar its conversion claim."); *see also Mastellone*, 82 A.2d at 384 ("In our opinion there is no requirement in a case [where rights in a stock certificate have been transferred to a third party] that there first be a demand and refusal to transfer. The conversion was committed when stock certificate T02759 was cancelled on defendant's books and the new certificate No. 571 [was] issued for the same stock.").

The facts of this case demonstrate that demand was not required before Cannon filed suit. Patterson's argument that demand was required proceeds under the assumption that Patterson had "lawful possession" of the Warrant. But, as explained above, Patterson did not have lawful possession of the Warrant because

he lacked a valid security interest in the Warrant. Patterson caused the Company to transfer the Warrant to him in November 2018 after Cannon defaulted. Patterson took full possession of the Warrant and all of the shares underlying the Warrant.[199] Patterson exercised the Warrant on October 27, 2020,[200] in return for which he obtained one million Warrant Shares. The Merger closed on December 29, 2020, after which shares of Romeo Systems were converted into shares of Romeo Power at an exchange ratio of 1:0.121730.[201] Under these facts, demand was not required. *See Mastellone*, 82 A.2d at 384 ("[I]f from other circumstances it is clear that the tort has been committed, the question needs no further settlement, and the court moves on to whatever other questions are in the case, usually the assessment of damages."). Therefore, "[b]ecause [Patterson's] actions amount to a denial of [Cannon's] rights in the [Warrant], [Cannon] was excused from demanding [its] return before initiating this action." *Wayman Fire Prot.*, 2014 WL 897223, at \*23.

---

[199] Tr. 383:3 (Patterson) ("They were my property after default."); *id.* at 384:10–13 ("Q. And do you agree that after default, every bit of the shares underlying the Cannon warrant became your property? A. Yes."); Patterson Dep. at 169:19–20 ("[I]f it's ten shares or ten billion shares, it's mine.").

[200] PTO ¶ 51.

[201] JX 200 at 3.

Cannon's failure to demand a return of the Warrant does not defeat her claim for conversion.[202] Accordingly, this court finds that Patterson improperly exercised the Warrant and therefore is liable for conversion of the Warrant.

## G. Damages

The measure of damages for conversion is the highest intermediate value between notice of the conversion and a reasonable time thereafter during which the stock could have been replaced. *See Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1023–24 (Del. 2011); *see also Diamond Fortress Techs., Inc. v. EverID, Inc.*, 274 A.3d 287, 307 (Del. Super. Ct. 2022) (The "measure of damages for wrongful conversion of stock or properties of like character is the higher value of either: '(1) its value at the time of conversion or (2) its highest intermediate value between notice of the conversion and a reasonable time thereafter during which the stock could have been replaced.'" (quoting *Schultz v. CFTC*, 716 F.2d 136, 141 (2d Cir. 1983)); *Segovia* 2008 WL 2251218, at \*21 ("The measure of damages for the conversion of stock . . . is the highest value of the stock for a reasonable time after the conversion occurs."). Cannon's damages "must also account for the resulting restraint of [Cannon's]

---

[202] Cannon also argues that Indeglia's communications with the Company's deal counsel in December 2020 amounted to a demand. The court need not reach that issue, because demand was not required. *See* Pl.'s Opening Br. 48 (citing Tr. 43:21–56:24; 247:6–9; 498:13–500:16; 54:21–55:19); Pl.'s Reply Br. 27–28; JX 181 at 25–26 (Company privilege log describing emails among Webb, Patterson, and Company's deal counsel regarding "advice on Cannon inquiry" dated between October 26, 2020 and December 1, 2020); JX 194 at 27–28 (same); JX 132; JX 133; JX 136; JX 143.

elective action in choosing when to sell the [Warrant] shares." *Vivint Solar, Inc. v. Lundberg*, 2024 WL 2755380, at *31 (Del. Ch. May 30, 2024), *aff'd*, 340 A.3d 541 (Del. 2025).[203] The parties agree on the appropriate framework but disagree as to its application.[204] Specifically, they dispute the appropriate definition of a "reasonable time" in which these damages should be measured.

### 1.      Reasonable period of time

What constitutes a reasonable period of time in this context is a question of law for the court to determine. *Diamond Fortress*, 274 A.3d at 307 (citing *Segovia*, 2008 WL 2251218, at *21). One may think of the "reasonable period" as the "time in which [the plaintiff] could have disposed of its shares without depressing the market had it been able to do so." *Vivint Solar*, 2024 WL 2755380, at *34 (citation modified) (quoting *Madison Fund, Inc. v. Charter Co.*, 427 F.Supp. 597, 609 (S.D.N.Y. 1977)). The *Duncan* Court provided the following reframing, "the time

---

[203] "The intuition behind this rule is that the issuer-defendant should bear the risk of uncertainty in the share price because the 'defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his [or her] securities had they been freely alienable.'" *Duncan*, 775 A.2d at 1023 (quoting *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 10(Del. Ch. 1992)). This approach also recognizes that "the issuer should not bear the risk of all subsequent share price increases because it is impossible to know whether and when the stockholders actually would have sold their shares during the restricted period." *Id.* at 1023–24. "The reasonable time framework, therefore, strikes a balance between placing the risk of uncertainty on the party in the wrong and avoiding speculative damages awards." *Vivint Solar*, 2024 WL 2755380, at *32 n.211.

[204] *See id.*

required for the stockholders to determine whether they wish to sell their shares immediately after the restrictions are lifted or to retain them for speculative purposes." 775 A.2d at 1024 n.14.

"Our courts have pursued a context-specific approach to determining the reasonable time period rather than focusing solely upon on when a non-breaching party could have disposed of its shares in the open market without the market price." *Vivint Solar*, 2024 WL 2755380, at *34 (collecting cases). The central dispute over damages concerns whether Cannon would have been subject to the 180-day lock-up period after the de-SPAC merger. The consequences are significant. One day after the merger, Romeo Power common stock traded as high as $32.73 per share. In the three trading days after the merger, Romeo Power common stock had an average high of $28.97 per share. But on June 28, 2021, the date that the lock-up expired, the highest trading price of Romeo Power common stock was $8.78 per share.

### a. The 180-day lock-up period does not apply to Cannon's damages calculation.

Patterson argues that the reasonable time period for measuring damages must be after the expiration of the 180-day lock-up period.[205] Patterson contends that Cannon could not have sold the Warrant Shares before the expiration of the lock-up period. He also argues that Cannon would have been subject to the lock-up had she

---

[205] Def.'s Answering Br. 61.

held a warrant for one percent of Romeo Systems's shares at the time of exercise, and that Cannon acknowledged in certain correspondence that the Warrant Shares would have been subject to the lock-up.

Part of Patterson's argument relies on the erroneous testimony of his expert and Webb concerning the terms of the Warrant. Section 10 of the Warrant contains its own 180-day lock-up provision, which would apply in the event of an initial public offering, but not a merger.[206] Nevertheless, Patterson's expert and Webb seem to believe that the terms of the Warrant itself would have prevented Cannon from selling the Warrant Shares for 180 days after the merger.[207] They do not. Patterson implicitly agrees that the lock-up provision in the Warrant was not triggered by the de-SPAC merger because he does not make that textual argument. If he believed it was a winner, he surely would have done so. Thus, the views of Patterson's expert and Webb are irrelevant, and they do not support the proposition that the Warrant Shares would have been subject to any lock-up period.

---

[206] The provision states, in pertinent part: "The Holder of this Warrant hereby agrees that such Holder shall not sell or otherwise transfer . . . any common stock . . . of the Company held by the Holder . . . during the one hundred eighty (180) day period following the effective date of the registration statement for the Company's initial public offering filed under the Securities Act . . . . The obligations in this section shall not apply to . . . a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future." JX 302 § 10.

[207] Tr. 467:13–21 (Webb); *id.* at 555:8–19 (Mathieu) (pointing to Section 10 of the Warrant as "evidence in the record that it causes it to be reasonable for me to include that calculation" as support for application of a lock-up period in assessing damages).

In a somewhat related argument, Patterson points to email communications in which Cannon believed that she would have been subject to the 180-day lock-up period.[208] Cannon's subjective view, as a non-lawyer, does not bind this court. *See Braga Inv. & Advisory, LLC v. Yenni Income Opportunities Fund I, L.P.*, 2020 WL 3042236, at *10 (Del. Ch. June 8, 2020) ("The legal effect of the [Warrant] Agreement, however, is an issue for the court to decide irrespective of whatever subjective belief the [Plaintiff or Defendant] may have had about its meaning.").

Next, Patterson contends that, had Cannon held the Warrant, she would have been among the stockholders required to sign a lock-up agreement as a condition of the merger. This argument is based upon supposition, biased testimony, and a lack of documentary support. Patterson testified on direct examination that "[w]e had to sign lock-ups or the deal wouldn't happen."[209] But on cross-examination, Patterson acknowledged that the merger was conditioned upon "key members" agreeing to a lock-up and that he was "unsure" whether RMG would have required Cannon's

---

[208] *See e.g.*, JX 128 (email communication between Cannon and Matthew Iacono, Account Vice President at UBS regarding Cannon pledging her shares after the de-SPAC merger and her understanding that, per the terms of the Warrant, these shares would be subject to a 180-day lockup); JX 147 (email chain between Cannon and Patrick Dial, Director of Indirect Sales RCN/Grande, in which Cannon stated, "it's taken quite a while, but a company I co-founded in 2014 is set to go public. After lock-up and associated delays, I'd like to open up the topic of paying our past-due amount[.]").

[209] Tr. 253:21–22 (Patterson).

Warrant Shares be subject to a lockup.[210] Similarly, Webb testified that a condition to the merger was "for legacy Romeo [Systems] security holders to agree to a lockup."[211] But she acknowledged that two stockholders did not sign lock-up agreements.[212]

The only executed lock-up agreement in the record is Patterson's,[213] and there are no electronic communications with stockholders requesting that they agree to a lock-up or even a compilation of stockholders who had agreed to do so. Indeed, the only evidentiary support for Webb's having entered into a lock-up is Patterson's testimony that he "believe[d]" Webb had signed a lock-up agreement.[214] Webb testified that a deal condition was that a certain number of shares would need to be subject to a lock-up, but there is no evidence concerning the minimum number of shares that RMG required to be locked up or the actual number of shares that were subject to lock-up agreements. That information would have been relevant because it would have helped to determine whether stockholders holding fewer shares than those underlying the Warrant were required to sign a lock-up agreement.

---

[210] *Id.* at 370:7–10; 371:23–372:3.

[211] *Id.* at 463:7–13 (Webb).

[212] *Id.* at 467:22–469:2.

[213] JX 204.

[214] Tr. 371:1–9 (Patterson).

It is possible that Cannon's shares in Romeo Power, created by the exercise of the Warrant, might have been subject to a 180-day lock-up period after the de-SPAC merger had Cannon been asked to sign a lock-up agreement and given the opportunity to negotiate one. But Cannon did not have an opportunity to decide whether she would agree to a lock-up as a condition to the merger. Instead, this court can only hazard a guess whether Cannon would have been subject to a lock-up restriction. Patterson's conversion of the Warrant created this issue. He has failed to present persuasive evidence to suggest that Cannon would have been subject to a lockup for the Warrant Shares. Therefore, this court will not impose a lock-up period when calculating damages.

### 2. The damages calculation

Both sides' experts agreed that, if the Warrant entitled Cannon to one-percent of Romeo Systems's fully diluted outstanding shares at the time of exercise, then damages should be calculated based on 965,246 Romeo Power shares.[215] Cannon's expert, Josh Schaeffer, Managing Director of Equity Methods Valuation and HR Advisory Practice, presented damages calculations under two reasonable time scenarios.[216] Schaeffer chose December 30, 2020, as the first "reasonable time" to

---

[215] *See id.* at 135:4–15 (Schaeffer); JX 184 at 16–17 (Schaeffer Report); JX 187 at 25 (Mathieu Report).

[216] *See generally* JX 184 at 14–17.

exercise which was "the most advantageous time . . . the Warrant would have been exercised on [that day] at the highest trading price of $32.73 as reported by S&P Capital IQ[.]"[217]  This resulted in a per-share  profit of $32.72, after deducting a $0.01 exercise price per share.[218]

Shaeffer chose a second reasonable time period starting on December 30, 2020, and restricting the stock sales to "5% of the daily volume at the volume weighted average price (VWAP) as reported by S&P Capital IQ."[219]  Under this scenario, Shaeffer calculates damages based on a sale of the shares over a three-day period,[220] with 33% of the shares being sold on each of December 30, 2020, December 31, 2020, and January 4, 2021.  This resulted in a per-share profit of $28.397, and a per share price of $28.407 before the deduction of the $0.01 exercise price.[221]  In both calculations, Schaeffer subtracted the balance of the Promissory Note and the 5% annually compounded interest calculated between March 1, 2017 and October 21, 2021 from the final damages calculation.  Shaeffer's calculations

---

[217] *Id.* at 15.

[218] *Id.*

[219] *Id.* at 16.

[220] *Id.* at 16–17

[221] *Id.* at 16

resulted in potential damages of $31,556,515.29 under scenario one and $27,383,756.83 under scenario two.[222]

Patterson's expert was Kenneth Mathieu, Senior Managing Director at FTI Consulting. Mathieu offered several alternative damages calculations based on various assumptions. This opinion has already rejected the factual and legal bases for two of those assumptions—that the Warrant Shares would have been subject to a lock-up and that the Warrant was only for one-million shares. Mathieu also criticizes Schaeffer's opinion underlying the first damages scenario, which assumes a sale of all 965,246 Romeo Power shares at the highest price on December 30, 2020.[223]

The court primarily adopts Scheaffer's scenario two. Schaeffer recognized that selling all 965,246 shares could put downward price pressure on the stock, noting "you can't necessarily sell all of these shares at once like that."[224] The award also accounted for the appropriate exercise price upon conversion in the merger. Schaeffer used the $0.001 per share exercise price under the Warrant agreement (after the ten-to-one stock split) for each of the 965,246 Warrant Shares, and made the necessary price adjustment required under the Merger Agreement, resulting in a

---

[222] *Id.* at 17.

[223] *See* JX 187 at 17–18.

[224] Tr. 135:16–23 (Schaeffer).

per share exercise price (after rounding up to the nearest cent) of $0.01.[225] The court concludes that this is an appropriate measurement period for calculating damages.

Therefore, Cannon is entitled to damages in the amount of $28.407 per share, minus $.01 per share,[226] resulting in a per share profit of $28.397 on 965,246 shares of Romeo Power common stock. This results in a base damages award of $27,419,743.12. Patterson is entitled to a credit of $108,802.24, the amount collectively remitted to Cannon on May 16, 2022, and August 11, 2023.[227] The calculation of pre- and post-judgment interest must deduct the $108,802.24 payment from Patterson to Cannon as of the date the two installments were made.

[225] Under the Merger Agreement governing the de-SPAC merger, an exchanged warrant "shall be converted into an option or warrant, as applicable, to purchase a number of shares of [RMO] [c]ommon [s]tock . . . equal to the product (rounded down to the nearest whole number) of (x) the number of shares of [Romeo Systems] [c]ommon [s]tock subject to the [] [o]ption or [] [w]arrant immediately prior to the [e]ffective [t]ime <u>multiplied</u> by (y) the [e]xchange [r]atio, at an exercise price per share (rounded up to the nearest whole cent)." JX 116 at 310. Under the Warrant, "[i]n the event that the outstanding shares of common stock are subdivided (by stock split, by payment of a stock dividend or otherwise) into a greater number of shares of such securities, . . . the Exercise Price shall be proportionately decreased[.]" JX 302 at § 7(b).

[226] JX 116 at 311 (The Merger Agreement governing the de-SPAC merger states in part, the number of shares of Romeo Systems common stock subject to the Warrant will be multiplied by "the [e]xchange [r]atio, at an exercise price per share (rounded up to the nearest whole cent) equal to (A) the exercise price per share of such [Romeo System] [w]arrant immediately prior to the [e]ffective [t]ime <u>divided</u> by (B) the [e]xchange [r]atio."). *See* Pl. Pre-Tr. Br. 46 ("Pursuant to the terms of the Cannon Warrant and the Merger Agreement, as a result of the Merger, the Exercise Price of the [] Warrant ($.01) should have been adjusted to be divided by the Exchange Ratio (0.121730) (equaling 0.082149) and then rounded up to the nearest whole cent, for an exercise price of $.09 per share of RMO common stock.").

[227] *See* JX 169 at 1.

### b. Patterson is liable for the full one percent on exercise.

Patterson contends that "if Cannon could somehow establish a 1%-on-exercise warrant, Patterson never received 1% of Romeo[ Power's Common S]tock as of exercise, and he cannot be held liable for misappropriating stock he never received. Patterson understood he was establishing a security interest in a one-million-share warrant. . . . [A]ny relief beyond that attributable to the one million shares must come from Romeo."[228] Patterson cites no support for the conclusion that the court should limit his liability to the amount of shares he actually received. He only contends that it "just seems fundamentally inequitable to say that he should be responsible because there's a different interpretation of what that instrument was worth."[229] But Patterson caused the Company to transfer the entire Warrant to himself in 2018 and then executed the Warrant in 2020, over which he maintained control until the effective date of the de-SPAC merger, which caused the Warrant to expire. Patterson's argument that he, at most, converted 1,000,000 shares is

---

[228] Def.'s Answering Br. 62–63.

[229] Post-Trial Arg. 129:6–9. The justification for this argument appears to be, at base, that Cannon already received enough; however, this court does not decide what the Warrant was worth based on how much Cannon deserves. The shares underlying the Warrant were priced by the market. *See id.* at 130:4–10 ("So Cannon gets paid six figures on this instrument. Originally, this was a five-figure issue. She gets paid six figures, and she is coming here saying that she should get eight figures because in this time period, this 2020-2021 time frame, the warrant was worth more; it was worth eight figures."). This court acknowledges that, in hindsight, this was not a good deal for Patterson, but "[p]arties have a right to enter into good and bad contracts, the law enforces both." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

incorrect; Patterson converted the entire Warrant and chose to exercise the converted Warrant for 1,000,000 shares. Therefore, this court is unwilling to limit Patterson's liability to only his elective exercise of the Warrant when Patterson could have, by the terms of the Warrant, exercised the entire Warrant.

### 3. Pre- and post-judgment interest

"In Delaware, prejudgment interest is awarded as a matter of right. Such interest is to be computed from the date payment is due." *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992) (citation modified). "Where damages do not accrue immediately upon breach, prejudgment interest is measured from the date on which the damages began to accrue." *Vivint Solar*, 2024 WL 2755380, at *37 (citing *Am. Gen.*, 622 A.2d at 13–14 (holding that "[t]he date of the breach . . . is not the appropriate starting point for the computation of interest" and instead the appropriate date from which to measure prejudgment interest is "the date on which [ ] damages began to accrue . . .")).

In addition to the base damages for the conversion of the Warrant, Cannon is entitled to prejudgment interest at the legal rate calculated with respect to each sale of 33.33% of the stock in Romeo Power which Cannon would have received after exercising the Warrant and the de-SPAC merger conversion ratio was applied on December 30, 2020, December 31, 2020 and January 4, 2021. This interest shall be compounded. *See Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160,

94

173 (Del. 2002) ("We agree with the Court of Chancery that its uncontested 'discretion to select a rate of interest higher than the statutory rate . . . includ[es] the lesser authority to award compounding interest.' … The rule or practice of awarding simple interest, in this day and age, has nothing to commend it—except that it has always been done that way in the past."); *Brown v. Ct. Sq. Cap. Mgmt., L.P.*, 2024 WL 1655418, at *3 (Del. Ch. Apr. 17, 2024) ("[F]or the last few decades, the Court of Chancery has awarded compound interest as a matter of practice.").  Interest shall compound quarterly.  *See id*. at *5; *See e.g., Murphy Marine Servs. of Del., Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *24 (Del. Ch. Sept. 19, 2022) ("When the court 'award[s] the legal rate of interest, the appropriate compounding rate is quarterly.'" (alteration in original) (quoting *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *12 (Del. Ch. May 20, 2004)).  As noted above, prejudgment interest should be computed to account for the $108,802.24 payment to Cannon in 2022 which occurred in two installments.

Post-judgment interest is also awarded as a matter of right.  *See Noranda Aluminum Hldg. Corp. v. XL Ins. Am., Inc.*, 269 A.3d 974, 978 (Del. 2021) (citing 6 *Del. C.* § 2301(a)).  "Prejudgment interest is part of the 'judgment' and, as such, should be included in the amount on which post-judgment interest accrues." *NGL Energy P'rs LP v. LCT Cap., LLC*, 319 A.3d 335, 338 (Del. 2024).  Cannon is awarded post-judgment interest at the legal rate on the combined amount of the

95

damages award and the prejudgment interest; post-judgment interest, like pre-judgment interest, will compound quarterly.

## III. CONCLUSION

For the reasons stated above, judgment is entered in favor of Plaintiff and against Patterson. The parties are to confer and submit a proposed final order. If there are issues that need to be addressed before a final order can be entered, then the parties must, within ten days, submit a joint letter identifying those issues and proposing a path forward to bring this matter to a conclusion at the trial level.